## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Joy Eberline, *et al.*,

|  |  |
|---|---|
| Plaintiffs, | Case No. 14-cv-10887 |
| v. | Judith E. Levy<br>United States District Judge |
| Douglas J. Holdings, Inc., *et al.*, | |
| Defendants. | |

_____/

## OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT [60] AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [56]

Three former students at defendants' cosmetology schools brought this putative class and collective action under the Fair Labor Standards Act ("FLSA") and state law. They allege that when they clean, do laundry, and restock products during the clinical training portion of defendants' curriculum, they are employees entitled to compensation. The key issues in this case are whether the plaintiff students or the defendant schools are the primary beneficiary of their relationship with one another, and whether certain tasks the students are required to complete—such as

cleaning the clinic, classrooms, and breakroom; doing the laundry; and restocking the products—are so far beyond the scope of their education that the tasks cannot fairly be considered a part of the training.

The Court is now presented with cross-motions for summary judgment. Plaintiffs bring a motion for partial summary judgment, seeking a determination that they are employees when they perform the aforementioned tasks. Defendants bring a motion for summary judgment, arguing that all of the students' claims must fail because they are students and not employees within the meaning of the FLSA.

For the reasons set forth below, plaintiffs' motion for partial summary judgment is granted, and defendants' motion for summary judgment is denied in part. In light of the fact that plaintiffs clarified during oral argument that they are only seeking employee status for time spent on cleaning, doing laundry, and restocking products, there is no dispute on the remainder of the time spent in the clinic. Therefore, defendant's motion for summary judgment as to the remaining time and the other portions of the parties' relationship is granted in part.

## I.    Background

Plaintiffs are three former cosmetology students at defendants' schools. Joy Eberline attended defendants' Ann Arbor school and graduated in 2012. Cindy Zimmermann attended defendants' Grand Rapids institute part-time and also graduated in 2012. Tracy Poxson graduated from defendants' East Lansing school in 2013. Each passed the state cosmetology licensing exam after graduating.

Defendants are four companies owned and operated by individual defendants Scott Weaver, T.J. Weaver, and Kristi Bernhardt. Scott and T.J. Weaver are the only directors of the defendant companies. Scott Weaver is the defendant with primary decision-making authority over the companies. (Dkt. 60-4 at 14-16.) He also serves on the Michigan Board of Cosmetology. (Dkt. 60-4 at 8.) Kristi Berhnhardt was the Chief Financial Officer of the corporate defendants during the time period at issue in this litigation.

The four corporate defendants are Douglas J. Institute, Douglas J. AIC, Douglas J. Exchange, and Douglas J. Holdings, Inc. Douglas J. Institute, Inc. operates cosmetology schools in Ann Arbor, East Lansing, Grand Rapids, and Royal Oak, Michigan, as well as Knoxville, Tennessee. (Dkt. 60-3 at 2.) Douglas J. AIC, Inc. operates an additional

cosmetology school in Chicago, Illinois. (Dkt. 60-4 at 14.) Douglas J. Exchange, Inc. operates salons in Ann Arbor and Rochester Hills, Michigan. (*Id.* at 31.) Douglas J. Holdings, Inc. owns each of the other defendant companies. (Dkt. 60-5.) Defendants Scott and T.J. Weaver each own half of Douglas J. Holdings, Inc. (Dkt. 60-6.)

Defendants' businesses are for-profit companies from which the Weaver defendants earn a considerable amount of money. For example, Douglas J. Institute earned a net profit of over $1.5 million each year between 2010 and 2014. (Dkt. 69-1.) The revenue driving this profit comes from tuition, kit sales,[1] beauty product sales, and salon services sales to the public. (Dkt. 69-2 at 2; Dkt. 69-3 at 2.) Students are charged $17,850 for the full-time program and $17,000 for the part-time program, inclusive of the kit fee. (Dkt. 60-23; Dkt. 60-26.) The companies are set up such that the net profit flowed through Douglas J. Holdings to Scott and T.J. Weaver as income. (Dkt. 60-15 at 6.)

At the time, defendants employed various types of workers as part of their business model. One type of worker defendants employed was

---

[1] Kit sales refer to the schools' requirement that students purchase certain equipment and beauty products from the school as part of their training. Students are charged $1,700 for the kit. (Dkt. 60-23 at 2.)

support staff. The support staff were broken into two positions: aesthetics and guest services. Defendants employed aesthetics personnel "to consistently ensure the Institute is kept clean and materials including towels and products are always available." (Dkt. 61 at 2.) These employees were primarily responsible for "keeping the place clean throughout the course of the day, [and] helping keep up with things such as laundry, any dishes, [and] cleaning." (Dkt. 60-4 at 19.) The printed job description for aesthetics personnel informed potential new hires that the role required "sweeping, dusting, polishing, window cleaning[,] shelf cleaning[,] . . . load[ing] and unload[ing] [the] dishwasher[,] . . . ensur[ing] [the] back-bar and stock areas are clean and tidy[,] [and] other general cleaning tasks as assigned." (Dkt. 61.)

The other support staff role in defendants' operations was guest services personnel. The guest services team primarily staffed the front desk to greet and assist clients when they came in the door. (Dkt. 60-34 at 5.) They were also responsible for keeping the waiting area "clean and tidy." (Dkt. 60-4 at 23.) The guest services training manual instructed staffers to "come out from behind the desk and hold doors, dust shelves, vacuum rugs, [and] clean windows" when they have down time. (Dkt. 60-

47 at 4.) They were also expected to perform hourly "aesthetic checks," in which they would tend to guests and "vacuum all rugs (including elevator) and clean the glass at all sets of doors." (*Id.* at 5.)

The work of the support staff was bolstered by a nighttime janitorial service. Defendants hired Daenzer Building Services to clean the facilities six nights each week. (Dkt. 60-34 at 19.)

In addition to support staff, defendants employed licensed cosmetology instructors. (Dkt. 60-4 at 19.) These individuals had both a state-issued cosmetology license and a state-issued cosmetology instructor's license (Dkt. 60-34 at 8), and they oversaw the cosmetology students' time in the clinic and in the classroom. (*Id.* at 9.) Each time a student saw a client in the clinic, the appointment would begin with a consultation between the student, the instructor, and the client to ensure the student provided the client with all of the services the client sought. (*Id.*) When the student finished, the instructor would review the student's performance to ensure it was adequate. (*Id.*)

The instructors also oversaw the work of student instructors. Student instructors are licensed cosmetologists who have returned to school to obtain an additional license to teach cosmetology. (*Id.* at 11.)

They were not paid for their time on the floor[2] and were expected to work hand-in-hand with the instructors to oversee the cosmetology students in the clinic. (*Id.* at 12.) Occasionally, a student instructor supervised the cosmetology students in lieu of a licensed instructor. (Dkt. 60-27 at 42.)

The instructors and student instructors supervised the cosmetology students' time in the clinic according to defendants' curriculum, which was based on Michigan state requirements for licensing cosmetologists. The state requires students to spend 1,500 hours in cosmetology school, in both a clinical and classroom setting, to become eligible to take a state-administered licensing exam. (Dkt. 60-20.) The student must then pass that exam to obtain a license to practice cosmetology. (*Id.*) As an accredited and licensed cosmetology school (Dkt. 60-18 at 6), defendants were obligated by law to conform their curriculum to the subject matter tested on the state licensing exam. Mich. Comp. Laws § 339.1205(2)(a).

The state-mandated curriculum requires cosmetology students to spend much of their time practicing their skills on clients under instructors' supervision. (Dkt. 60-20.) Students worked in the clinic throughout their enrollment, and they were required to spend certain

---

[2] None of the plaintiffs are student instructors.

amounts of time on different skills and treatments. For example, the state curriculum required eighty practical hours of facials, fifty-five practical hours of manicures, 400 practical hours of hairdressing, 170 practical hours of hair coloring, and 180 practical hours of chemical hair restructuring, among other categories of skills. (*Id.*) It also mandated forty clinical hours on "Sanitation/Patron Protection, Laws & Rules, Personal Hygiene, Salon Management, [and] Mechanical & Electrical Equipment Safety." (*Id.*) Neither the state-mandated clinical curriculum nor defendants' application of that curriculum include any time in the clinic for learning the salon business. (*Id. See also* Dkt. 60-46.)

Defendants implemented Michigan's cosmetology curriculum, using their own grading criteria and course outlines, in five units: Cosmetology Introduction, Alpha, Beta, Gamma, and Salon Life. (Dkt. 60-44.) Over the course of the units, which included both classroom and clinical time, students learned a wide range of necessary cosmetology skills, such as how to cut hair in various styles, color hair, apply makeup, perform a facial, perform a manicure, chemically treat hair, and many others. (*See generally* Dkt. 60-41.) The curriculum called for students to spend multiple hours over multiple weeks learning these skills in the

classroom and clinic, but called for just three hours of classroom training in the "Salon Business." (*Id.*) Students were also taught lessons in patient protection and tool sanitation, but the curriculum included no lessons on how to do laundry, restock products, or perform other basic cleaning tasks in a salon. (*See Id.*)

The Michigan state-administered cosmetology exam mirrors what is set forth in the curriculum and tests students' competency in various areas related to the profession. It tests both theory and clinical ability. (Dkt. 60-40.) On the clinical portion of the exam, students are asked to perform a manicure, a facial, chemical services, haircutting services, and more. (*Id.*) Applicants are tested on sanitation/patient protection during the clinical exam, including whether they use sanitized tools; wash their hands; dispose of waste in the trash; and "[e]nsure[ ] [the] workstation remains sanitary by changing towels when soiled, cleaning spills, and maintaining sanitary implements/materials throughout service." (*Id.* at 10.)

Students are not permitted to sit for the exam unless they "have successfully completed a course of study of at least 1,500 hours." (Dkt. 60-40 at 14.) The students tracked their qualifying hours on a log. Each

time a student completed a task, the instructor would affirm its completion on that log. (Dkt. 60-27 at 46; Dkt. 60-46.) The students tracked their hours by type of service performed so that they could ensure they spent the requisite number of hours on each type of service. (Dkt. 60-46.)

In addition to completing the required treatments and services found on the hours log and in the curriculum, plaintiffs spent a significant amount of time on tasks outside the curriculum, such as cleaning. Eberline explained:

> there was always the laundry to be done so [students would] have to do load after load of towels, of course, washing them, drying them, folding them, putting them in the cabinets where they belong, et cetera; of course, emptying the dirty ones out and putting those in the laundry. But aside from that, there was the continuous sweeping of the floors, the entire floor, not just the area where [a student was], the whole salon floor. If somebody at the end of the day didn't wipe down their own stuff and they're already gone, which happened daily, [students] would not be allowed to leave until every station was like you could eat off of it pretty much. Dusting of the shelfs [sic] in the guest services area, dusting of all the products that were sitting on the shelves, Windexing or whatever glass cleaner they prefer to use.

(Dkt. 60-27 at 30-31.)

Poxson had a similar experience, noting that they "would have to do laundry, [ ] would fold the towels, wash the towels, [and] clean the color station out . . . ." (Dkt. 60-28 at 43.) There was "a break room downstairs that [students] had to clean" (*Id.* at 43), as well as a requirement to "stock the shelves and wipe them down" in the reception area. (*Id.* at 37.) Students were instructed to maintain the shampooing station, which required them to "take all the shampoo bottles and wipe them all down, wipe the bowls down, chairs down, [and] fill the shampoo back up from . . . stock bottles that were under the sink." (*Id.* at 44.) They also cleaned the wax area and color station. (*Id.*)

The same was true for Cynthia Zimmermann. She testified that students were asked to "clean the back bar where the shampoo bowls and stuff are, clean where the color station was, do the laundry, take it from the washer to the dryer, fold when it came out of the dryer, empty the trash, and then when we had classroom, we had to do the boards, wipe those down, clean off the tables, clean the floor, sweep the floor." (Dkt. 60-29 at 33.)

The plaintiffs each testified that they would spend multiple hours cleaning on a slow day and at least half an hour cleaning every day. (Dkt.

60-27 at 44, 48; Dkt. 60-28 at 44; Dkt. 60-29 at 35.) Spending this amount of time cleaning was not voluntary, but rather something instructors were encouraged to have the students do. (*See* Dkt. 60-39. *See, e.g.*, Dkt. 60-27 at 30-31, 42-44; Dkt. 60-28 at 25-26, 44-45; Dkt. 60-29 at 33-34.) Defendants provided their instructors with multiple documents that directed them to have the students clean, do laundry, and restock products when there was "down time" (Dkt. 60-39) or when there were "not enough external guests or models scheduled to keep the students busy with guests throughout the shift." (Dkt. 60-37.) When an instructor followed this guidance and asked a student to clean, it was mandatory because, as Scott Weaver testified, "if a student is refusing to participate in any activity, then they would be sent home for the day . . . ." (Dkt. 60-34 at 22.) Being sent home for the day would prevent a student from accumulating training hours that day, and would force the student to make up the hours at a later date.

In addition, there were some days where "it was strictly cleaning." (Dkt. 60-28 at 25.) Those days were Mondays, when the clinic was closed to clients during the day. Students who had fallen behind on their hours

or wanted to get ahead were able to come in and participate in a "deep cleaning" of both "the clinic and the classrooms." (Dkt. 60-28 at 25.)

Plaintiffs spent a substantial amount of time on these cleaning tasks. Eberline testified that on a slow day in the clinic she spent about "four hours of the day" on cleaning and other work outside the curriculum (Dkt. 60-27 at 44) and a "half hour to forty-five minutes out of the day" on a busy day. (*Id.* at 48.) She estimated that she spent 348 of her 1,075 clinical and unassigned hours on cleaning,[3] representing 32% of her time spent in the clinic. (Dkt. 71 at 23.) Poxson testified that on a slow day, she spent "between two and three hours" cleaning and the last half hour of her day cleaning on a busy day. (Dkt. 60-28 at 44.) She estimated that she spent 304 of her 1,075 clinical hours on cleaning, representing 28% of her time spent in the clinic. (Dkt. 71 at 23.) Zimmermann testified that she spent "about a half hour" cleaning each day, but acknowledged the amount of time fluctuated depending on how much there was to do. (Dkt.

---

[3] Of the 1,500 educational hours cosmetology students are required to complete, 965 must be in the clinic. (Dkt. 60-20.) The curriculum also contains 110 unassigned hours. (*Id.*) Because the record does not set forth how the unassigned hours are typically spent, the Court assumes that all of the 110 unassigned hours are completed in the clinic. This is a favorable view of the facts for defendants, as required by Fed. R. Civ. P. 56, because the greater number of overall clinical hours students have subsequently reduces the percentage of clinical time spent cleaning.

60-29 at 34.) She estimated that she spent 150 of her 1,075 clinical hours on cleaning, representing 14% of her time in the clinic. (Dkt. 71 at 23.) Taken together, plaintiffs on average spent 267 of their 1,075 required hours cleaning. This accounted for an average of 25% of their time in the clinic. (*Id.*)

Cleaning was not the only work students did outside the curriculum. On some days the students would be assigned to guest services. (Dkt. 60-27 at 46.) When they were assigned to guest services, students would "greet guests when they would come in . . . run the tickets for the guest services employees, get the guests their preferred coffee, tea, whatever, and then . . . sweeping or dusting or whatnot." (*Id.*)

Students were also expected to encourage clients to purchase the products used in the clinic. Though not part of the state-mandated curriculum, making sales pitches was part of defendants' curriculum. (Dkt. 60-34 at 28.) Students were evaluated on whether they engaged in certain "behavior" that is "intended to motivate guests to purchase product." (*Id.*) Defendants also "track[ed] the student's per guest numbers of retail sales of the product" and provided incentives to the students who sold the most product. (*Id.* at 29.)

Because these tasks were outside the scope of the state-mandated curriculum, the hours log form had no designated space to credit the students for these hours. In order to credit the students for hours actually spent in the clinic—even if those hours were not spent on tasks within the curriculum—instructors told students to "just put down what [they] needed hours in. It didn't matter if we really didn't do that that day . . . ." (Dkt. 60-28 at 25.) It was mandatory that the students spent 1,500 total hours in school, and toward the end of the program students were "instructed to magically make those numbers work, so [students were] to take whatever hours that [they] haven't actually done, whatever these things up here say, and [students would] have to fill in blanks and rework the numbers to make it all work out." (Dkt. 60-27 at 46.)

Even though defendants had students perform tasks outside of the curriculum and record their hours improperly, students graduating from defendants' schools still passed the state cosmetology licensing exam at a high rate. As of 2012, 85% of defendants' students obtained a cosmetology license. (Dkt. 56-21.)

## II.   Summary Judgment Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III. Legal Analysis

The dispositive question on these cross motions is whether plaintiffs were defendants' employees while they were students at defendants' cosmetology schools. Because the parties disagree which primary beneficiary factor test this court should apply to determine whether plaintiffs were employees and how the test functions in situations where a student may be a student and an employee at different times, it is necessary to discuss the context of the Sixth Circuit's primary beneficiary test and arrive at a framework for this analysis. Then, the

16

framework is applied to the plaintiffs' motion for partial summary judgment. Finally, the defendants' motion for summary judgment is analyzed under that framework.

a. *The* Laurelbrook *Framework*

The FLSA, "[w]ithout doubt . . . covers trainees, beginners, apprentices, or learners if they are employed to work for an employer for compensation." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 151 (1947). But for that coverage to attach, the "trainees, beginners, apprentices, or learners" must be "employees" as defined by the Act. Id. The FLSA does not cover "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, work[s] in activities carried on by other persons either for their pleasure or profit . . . .'" *Solis v. Laurelbrook Sanitarium and Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (quoting T*ony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985)). "Whether a particular situation is an employment relationship is a question of law" for the Court to decide. *Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994).

The FLSA defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). This definition of an employee is

unhelpful as a starting point for the analysis of whether an individual is an employee of another, and "labels that parties may attach to their relationship" do not control. *Laurelbrook*, 642 F.3d at 522 (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528 (1950)). Instead, "it is the 'economic reality' of the relationship between parties that determines whether their relationship is one of employment or something else." *Id.* That economic reality is evaluated on "a case-by-case basis upon the circumstances of the whole business activity." *Id.* (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)). But to "state that economic realities govern is no more helpful than attempting to determine employment status by reference directly to the FLSA's definitions themselves." *Id.* "There must be some ultimate question to answer, factors to balance, or some combination of the two." *Id.*

In order to render an "economic realities test" into something useful for courts to apply, the Sixth Circuit has instructed that "the proper approach for determining whether an employment relationship exists in the context of a training or learning situation is to ascertain which party derives the primary benefit from the relationship." *Id.* at 529. Other circuits have similarly concluded that determining the primary

beneficiary of the relationship is the proper approach for evaluating whether a student, trainee, or intern is an employee under the FLSA. *E.g.*, *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2015); *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199 (11th Cir. 2015); *Benjamin v. B&H Educ., Inc.*, 877 F.3d 1139 (9th Cir. 2017); *Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005); *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023 (10th Cir. 1993); *see also Hollins v. Regency Corp.*, 867 F.3d. 830 (7th Cir. 2017) (acknowledging the Second Circuit's *Glatt* decision and the Eleventh Circuit's *Schumann* decision as persuasive, but not explicitly applying the primary beneficiary analysis). Indeed, this notion that employment status turns on who is the primary beneficiary of the relationship was first articulated by the Supreme Court nearly seventy years ago. *See Walling*, 330 U.S. at 153 (holding trainees were not employees because they received training "in a manner which would most greatly benefit the trainees").

Though the courts of appeal generally agree that the primary beneficiary test is the correct analysis in this context, they have each applied the test in slightly different ways. For example, in *Glatt*, a case where the court was asked to decide if interns working for a film

production company were employees, the Second Circuit established a seven-factor balancing test that looks at the relationship between the intern's education and the work performed at the internship. *Glatt*, 811 F.3d at 536-37; *see also Schumann*, 803 F.3d at 1212-13 (adopting the *Glatt* factors); *Benjamin*, 877 F.3d at 1147 (same). In contrast, in *Reich*, a case brought by firefighters alleging they should be paid for time spent training at a fire-fighting academy, the Tenth Circuit took a different approach and adopted a balancing test using the Department of Labor Wage and Hour Division's proposed six-factor analysis derived from *Walling*. *Reich*, 992 F.2d at 1027.

The Sixth Circuit's application of the primary beneficiary test, which binds this Court, is different still from *Glatt* and *Reich*. *See Benjamin*, 877 F.3d at 1146 (contrasting *Schumann* and *Laurelbrook* when observing "[o]ther courts have adopted either *Glatt*'s primary beneficiary test or have established a similar test in cases involving interns or trainees"). In fact, the *Laurelbrook* court explicitly rejected the formulation of the primary beneficiary test used in *Reich*. *Laurelbrook*, 642 F.3d at 525 ("We find the [Wage and Hour Division]'s test to be a poor method for determining employee status in a training or educational

setting."). Instead, the court identified "[f]actors such as whether the relationship displaces paid employees and whether there is educational value derived from the relationship" as relevant, but not exclusive, "considerations to guide the inquiry." *Id.* at 529. It went on to weigh those factors and others in four categories: benefits to the institution, considerations unique to the educational context that offset the benefits to the institution, tangible benefits to the students, and intangible benefits to the students. *Id.* at 530-33.

However, because the primary beneficiary test is the "framework for discerning employee status in learning or training situations," it is not applicable to everything a student or intern may do over the course of her education or internship. *See Laurelbrook*, 642 F.3d at 529. As the Eleventh Circuit recognized in *Schumann*, an all-or-nothing determination of employee status is not appropriate in every learning or training situation. *See Schumann*, 803 F.3d at 1214-15. In some such contexts, the employer "takes unfair advantage of the student's need to complete the internship by making continuation of the internship implicitly or explicitly contingent on the student's performance of tasks or his working of hours well beyond the bounds of what could fairly be

expected to be a part of the internship." *Id.* at 1214-15. Where this is the case, "the student would not constitute an 'employee' for work performed within the legitimate confines of the internship but could qualify as an 'employee' for all hours expended in . . . tasks so far beyond the pale of the contemplated internship that it clearly did not serve to further the goals of the internship." *Id.* at 1215.

The Eleventh Circuit is explicit about what the court in *Laurelbrook* assumes: the primary benefit test only applies to activities within the "learning or training situation." Though the *Schumann* court refers to the plaintiffs as "students" or "interns" and their program with the defendant as an "internship," the "training or learning situation" terminology from *Laurelbrook* is analogous. *Schumann* recognizes that not all activity a student may do is part of the learning or training situation. Activity beyond the confines of the learning situation falls within the protection of the FLSA when the employer takes unfair advantage of the student's need to complete the education to require the student to perform those tasks.

In this case, the *Schumann* inquiry is directly on point because this case is nearly identical to *Schumann*. In *Schumann*, the plaintiffs were

college students training to become nurse anesthetists. 803 F.3d at 1203. They were required "to participate in a minimum of 550 clinical cases" as part of obtaining their degree and license, and they sued the anesthesiology practice that hosted their clinical training. Thus, even though the *Schumann* court referred to the relationship between the plaintiffs and the defendant as an "internship," they, like plaintiffs here, were students completing the clinical training required to earn their degree and professional license.

Given the Sixth Circuit *Laurelbrook* test and the threshold matter of whether an activity is within the training or learning situation from *Schumann*, courts must make several inquiries when presented with a possible hybrid situation like that in *Schumann*. First, the Court must first determine if the complained of activity is within the learning situation. If the activity is within the learning situation, then the primary beneficiary test as articulated in *Laurelbrook* applies. But if the activity is outside the training or learning situation, meaning it is "well beyond the bounds of what could fairly be expected to be a part of the internship" or educational program, then the Court must look at whether the employer is taking unfair advantage of the student's need to complete the

internship or educational program. *Schumann*, 803 F.3d at 1214-15. If so, then the student would "qualify as an 'employee' for all hours expended in . . . tasks so far beyond the pale of the contemplated internship that it clearly did not serve to further the goals of the internship." *Id.* at 1215.

### b. *Plaintiffs' Motion for Partial Summary Judgment*

Plaintiffs bring a motion for partial summary judgment seeking a determination that they are employees with respect to cleaning, laundry, and restocking tasks.[4] As set forth above, the Court applies the following framework. First, the Court addresses the threshold question of whether these activities are within the training or learning situation. If these activities are within the training or learning situation, then the *Laurelbrook* primary beneficiary test is applied. But if these activities are not, then the inquiry moves on to whether the defendants took unfair advantage of plaintiffs' need to complete their education by requiring them to complete those tasks outside of the training or

---

[4] At oral argument, plaintiffs clarified that the current motion did not seek to have all of the time they spent in the clinic declared work under the FLSA. Rather, they explained that the motion is limited to the time spent cleaning, doing laundry, and restocking products as described in plaintiffs' brief. (Dkt. 60 at 14.)

learning situation. Finally, if the defendants did take unfair advantage, then the Court must ask if the time spent on the tasks was *de minimus*.

      i. Whether the Activities are within the Training or Learning Situation

Though the Sixth Circuit has not yet considered a case where it was required to determine if activity was within the training or learning situation, prior cases on whether a program as a whole was educationally valid is instructive. For example, in *Laurelbrook* students performed manual labor, which was considered a core part of the students' education because "receiving a well-rounded education—one that includes hands-on, practical training—is a tenet of the Seventh–day Adventist Church," and Laurelbrook was a Seventh-day Adventist school. 642 F.3d at 531.

Conversely, the district court in *Marshall v. Baptist Hospital, Inc.* found students were performing manual tasks that were not related to their education and training, so much so that the whole program was so deficient it could not constitute an education. 473 F. Supp. 468, 474-77 (M.D. Tenn. 1979), *rev'd on other grounds, Marshall v. Baptist Hospital, Inc.*, 668 F.2d 234 (6th Cir. 1981). There, X-ray technician "trainees" were required to have forty hours a week in "classroom and practicum training" by spending mornings in clinical training at a hospital and

afternoons in the classroom in order to complete the program, receive a certificate, and then sit for a licensing examination. *Id.* at 470-71. The court found that the trainees were employees because they either received no instruction when they performed X-rays or they performed tasks that were "at best only of peripheral value" to their educational goals. *Id.* at 475. On tasks related to the subject matter of education, the court specifically looked at the fact that students did not keep any records of their time spent as required by the training program and that students were unsupervised when they performed X-rays. *Id.* On the tasks unrelated to the subject matter of their education, the court looked at whether other staff was hired to complete the work. *Id.*

Plaintiffs show that the specific manual activities of cleaning, doing the laundry, and restocking products were outside of the training and learning situation based on the state mandated curriculum requirements, the defendants' curriculum, the lack of supervision during these activities, the lackadaisical recordkeeping, and the fact that support staff was also hired to complete these tasks.

The state curriculum demonstrates the activities were outside of the training or learning situation. Though the state mandated

curriculum includes education about sanitation of tools and the cosmetologist's work space, Zimmermann explained that sanitation is "cleaning of your tools so they are sanitized." (Dkt. 60-29 at 33.) Zimmerman's observation is consistent with the requirements set by the Michigan Board of Cosmetology. It tests sanitation and patron protection in the practical portion of the licensing exam by ensuring that the applicant uses sanitized tools, washes her hands, disposes of waste in the trash, and "[e]nsures [the] workstation remains sanitary by changing towels when soiled, cleaning spills, and maintaining sanitary implements/materials throughout service." (Dkt. 60-40.) Students are not tested on their ability to do laundry, restock products, or complete deep cleaning tasks outside their workstation.

Moreover, defendants' printed curriculum aligns with the state's testing criteria and does not purport to instruct students on these extra-curricular tasks. Nor were these tasks were part of a general education regarding the salon business. Defendants' curriculum included three classroom hours on the "Salon Business" and no clinic time on the subject. Those three classroom hours were the extent of plaintiffs' education in the salon business. Plaintiffs were not taught key salon business skills

such as how to permit and license a salon, develop a business plan, hire and train employees, keep required records, pass regulatory inspections, or general principles of business operations. (Dkt. 60-27 at 40-41.).

Other evidence demonstrates that these tasks were not within the training or learning situation. As in *Marshall*, defendants provide no evidence that students received instruction on cleaning, doing the laundry, or restocking the shelves. Furthermore, similar to the students in *Marshall* who did not keep records consistent with the training program, the students here were instructed to place the time they spent cleaning wherever they needed time. And again as in *Marshall*, defendants employed staff to complete the tasks at issue. Here, aesthetics staff were responsible for the same cleaning and laundry tasks as student.

As the *Schumann* court warned, there may be cases where the activities are "so far beyond the pale of the contemplated [training] that it clearly did not serve to further the goals of the [training]." *Schumann*, 803 F.3d at 1215. This case is one of them. Cleaning, doing laundry, and restocking products is outside of the training and learning situation because those activities are beyond the pale of the contemplated

educational goals of the cosmetology program as shown by the state mandated curriculum, the defendants' curriculum, the lack of supervision given students while completing these tasks, the lack of proper recordkeeping, and the fact that staff was hired to do the same tasks. Unlike *Laurelbrook* where the manual labor was a key part of the education, these tasks are beyond the pale of the contemplated cosmetology education and training the plaintiffs sought with defendants.

Defendants rely on three cases cited in *Laurelbrook* for the proposition that manual labor—like what defendants required of plaintiffs—was part of their education. The first two are distinguishable along the lines of *Laurelbrook*. In *Blair v. Wills*, a student sued a Baptist boarding school alleging he was an employee when completing manual labor and the Eleventh Circuit held that the students' labor was "an integral part of the educational curriculum," and he was thus not an employee. 420 F.3d 823, 829 (8th Cir. 2005). In *Woods v. Wills*, the district court relied on *Blair* to find that labor was part of a curriculum designed to "develop Christian values of respect for authority, for Biblical self-image, and self-discipline, and to foster academic development." 400 F.

Supp. 2d 1145, 1166 (E.D. Mo. 2005), which relies on *Blair*. However, the labor at issue in those cases was deeply intertwined with the schools' educational mission and curriculum, and reflected the religious values that were a fundamental part of each institution as in *Laurelbrook*. Defendants still present no evidence showing that the manual labor here, cleaning, doing laundry, and restocking products, is similarly so crucial and steeped into their educational mission and curriculum.

Defendants then turn to *Bobilin v. Board of Education, State of Hawaii,* where the district court determined that students working in the school cafeteria were not employees by deferring to the local school district's determination of what activities had educational value. 403 F. Supp. 1095, 1109 (D. Haw. 1975). However, *Bobilin* is simply consistent with this Court's findings because the court deferred to state and local education officials to determine what type of labor had educational value. Here, the Michigan Board of Cosmetology indicates through the content tested on its licensing exam and its hours requirements that the type of manual labor these plaintiffs engaged in is not part of an education in cosmetology.

> ii. *Whether the Possible Employer Took Unfair Advantage of Students' Need to Complete Their Educational Program*

Once the Court has determined that an activity is not within the training or learning situation, the inquiry moves to whether the employer took "unfair advantage" of the students by making "continuation of [the educational program] implicitly or explicitly contingent on the student's performance of [those] tasks." *See Schumann*, 803 F.3d at 1214. Such is the case here because defendants explicitly and implicitly required plaintiffs to clean, do laundry, and restock products.

Defendants have not disputed that students were explicitly required to complete these tasks. Defendants provided instructors with a document called "Student Down Time Ideas" that directed instructors to assign cleaning tasks when students were not working with a client. (Dkt. 60-39.) Another document detailing "clinic management procedure" also urged instructors to assign cleaning tasks when students were not working with a client. (Dkt. 60-37.) Furthermore, students were unable to decline to perform these tasks because, as defendant Scott Weaver testified, that "if a student is refusing to participate in any activity, then

they would be sent home for the day" and would be unable to accumulate practical hours towards graduation. (Dkt. 60-34 at 22.)

Particularly important is that the requirement was also implicit due to the stark power imbalance between defendants and plaintiffs. Plaintiffs had no alternatives to completing the cleaning, laundry, and restocking tasks. They have little incentive to be sent home for refusing to clean due to the cost of the program, about $17,850 (Dkt. 60-25), and the accompanying student loans. (Dkt. 60-27 at 4; Dkt. 60-28 at 19; Dkt. 60-29 at 24.) Defendant Scott Weaver made it very clear that uncooperative students were unsuccessful in the defendants' program. Furthermore, plaintiffs needed to complete the program and obtain a license to practice cosmetology in order work in their chosen profession and pay off their loans. Accordingly, they had little ability or incentive to say no when defendants' instructors told them to complete tasks that were otherwise part of the job description of defendants' paid aesthetics and guest services staff.

### iii.  Whether the Tasks Completed Were De Minimus

Even after a court has concluded that an activity is outside the training or learning situation and that the employer has taken unfair

advantage of the student or intern, the activity must also not be *de minimus*. The FLSA includes an important limitation in that it only requires payment for tasks where the "employee is required to give up a substantial measure of his time." *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012) (quoting *Hill v. United States*, 751 F.2d 810, 814 (6th Cir. 1984)). Employers need not pay for *de minimis* work, such as when "the matter in issue concerns only a few seconds or minutes of work." *Id.*

Here, plaintiffs spent a substantial amount of time on these non-curricular tasks. They testified they spent as much as "four hours of the day" cleaning on some days (Dkt. 60-27 at 44), and spent at least "a half hour" cleaning each day. (Dkt. 60-29 at 34.) Plaintiffs' counsel estimated Eberline spent 32% of her clinic time cleaning, Poxson spent 28% of her clinic time cleaning, and Zimmermann estimated 14% of her clinic time cleaning, which averages out to one quarter of clinic time spent cleaning. (Dkt. 71 at 23.) This amount of time is more than a few seconds or minutes, and thus the complained of tasks were not *de minimis*.

There is no genuine issue of material fact as to the nature and extent of plaintiffs' cleaning, restocking, and laundry tasks because

defendants offer no competing figures. Accordingly, they were employees as a matter of law with respect to those tasks. Because they were employees, the FLSA entitles them to compensation for the time spent on those tasks.

## IV. Conclusion

In conclusion, even though plaintiffs were the primary beneficiaries of their relationship with defendants within the confines of a training or learning situation, *see Laurelbrook*, 642 F.3d at 529, defendants required plaintiffs to engage in certain tasks "so far beyond the pale of the contemplated internship [clinical program] that it clearly did not serve to further the goals of the internship [clinical program]." *See Schumann*, 803 F.3d at 1215. Thus, plaintiffs were employees with respect to those tasks—cleaning, laundry, and restocking products—which accounted for more than a *de minimis* portion of their time, but not with respect to any other activities performed in the clinic or in the classroom.

Accordingly, plaintiffs' motion for partial summary judgment (Dkt. 60) is GRANTED, and defendants' motion for summary judgment is DENIED with respect to the cleaning, laundry, and restocking tasks, but GRANTED as to all other tasks. (Dkt. 56.)

IT IS SO ORDERED.

Dated: October 1, 2018         s/Judith E. Levy
Ann Arbor, Michigan         JUDITH E. LEVY
                                   United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 1, 2018.

s/Shawna Burns
SHAWNA BURNS
Case Manager