UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| JOY EBERLINE, CINDY ZIMMERMAN, and TRACY POXSON, individually and on behalf of all others similarly situated, | Case No. 5:14-cv-10887<br><br>Hon. Judith E. Levy<br>Magistrate  Michael J. Hluchaniuk |
| Plaintiffs, | |
| v. | |
| DOUGLAS J. HOLDINGS, INC.,<br>DOUGLAS J. AIC, INC.,<br>DOUGLAS J. INSTITUTE, INC.<br>DOUGLAS J. EXCHANGES, INC.,<br>SCOTT A. WEAVER and<br>TJ WEAVER, | |
| Defendants. | |

_____/

**DEFENDANTS' RENEWED MOTION FOR SUMMARY DISPOSITION
AND APPLICATION OF THE SIXTH CIRCUIT'S DECISION**

As directed in the Court's April 2, 2021 Text-Only Order, Defendants Douglas J. Holdings, Inc.; Douglas J. AIC, Inc.; Douglas J. Institute, Inc.; Douglas J. Exchanges, Inc.; Scott A. Weaver; and TJ Weaver; file this renewed motion for summary judgment on all of Plaintiffs' claims in the above-captioned matter, pursuant to Federal Rule of Civil Procedure 56.

1.     Defendants seek summary judgment through the application of the factors included in the Sixth Circuit's December 17, 2020 Opinion and Order, remanding this matter to the Court for proceedings consistent with that Opinion and Order.  *See Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006 (6th Cir. 2020).

2.     Under those factors, Plaintiffs are not Douglas J's "employees" as that term is defined in the Fair Labor Standards Act, 28 U.S.C. § 203. And as a result, Plaintiffs' FLSA and similar state-law claims all fail. *See id.* at 1012; *Allen v. MGM Grand Detroit, LLC*, 675 N.W.2d 907, 909 (Mich. Ct. App. 2003) (observing that the "MWL parallels the FLSA," with the only difference being the statutes of limitation); *Callahan v. Chicago*, 78 F. Supp. 3d 791, 821 (N.D. Ill. 2015), *aff'd sub nom. Callahan v. City of Chicago, Illinois*, 813 F.3d 658 (7th Cir. 2016) ("Because the IMWL parallels the FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both.").

3.     Additionally, even if the Court only grants Douglas J summary judgment on Plaintiffs' FLSA claims, it should still dismiss the state-law claims for lack of jurisdiction. *See Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 210 (6th Cir. 2004) ("Generally, 'if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.'") (quoting *Taylor v. First of Am. Bank–Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992)).

4.      As the Court is aware, Defendants continue to disagree with the Sixth Circuit's analysis and are pursuing review by the U.S. Supreme Court. Absent action by the Supreme Court, Defendants acknowledge that the Sixth Circuit's ruling is controlling and must be applied by this Court. Defendants retain and preserve all their arguments that the Sixth Circuit's approach is incompatible with the Supreme Court's decision in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), the Sixth Circuit's own precedent in *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518 (6th Cir. 2011), and other jurisprudence interpreting the FLSA. But Defendants will not reiterate those arguments here.

5.      In accordance with LR 7.1, Defendant requested, but did not obtain, concurrence in the relief sought.

Defendants' motion is fully supported by the accompanying brief in support.

Respectfully submitted,

Dated:  May 21, 2021                        WARNER NORCROSS + JUDD LLP

                                            *s/ Matthew T. Nelson*

Michael G. Brady                            Matthew T. Nelson
Adam T. Ratliff                             Amanda M. Fielder
2715 Woodward Avenue, Suite 300             150 Ottawa Avenue NW, Suite 1500
Detroit, Michigan 48201                     Grand Rapids, Michigan 49503
313.546.6000                                616.752.2000
mbrady@wnj.com                              mnelson@wnj.com
aratliff@wnj.com                            afielder @wnj.com

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | |
|---|---|
| JOY EBERLINE, CINDY ZIMMERMAN, and TRACY POXSON, individually and on behalf of all others similarly situated, | Case No. 5:14-cv-10887 |
| | Hon. Judith E. Levy |
| Plaintiffs, | Magistrate Michael J. Hluchaniuk |
| v | |
| DOUGLAS J. HOLDINGS, INC., DOUGLAS J. AIC, INC., DOUGLAS J. INSTITUTE, INC. DOUGLAS J. EXCHANGES, INC., SCOTT A. WEAVER, and TJ WEAVER, | |
| Defendants. | |

_____/

**DEFENDANTS' BRIEF IN SUPPORT OF
RENEWED MOTION FOR SUMMARY JUDGMENT AND
APPLICATION OF THE SIXTH CIRCUIT'S DECISION**

**ORAL ARGUMENT REQUESTED**

## ISSUES PRESENTED

I.   Whether this Court should dismiss Plaintiffs' claims under the Fair Labor Standards Act (FLSA) because the FLSA only applies to employees, one cannot be an employee without an expectation of compensation, and Plaintiffs concede that they never expected to be compensated for any of their time while attending Douglas J's educational program.

   **Defendants' Answer:    Yes.**

II.  Whether each Plaintiff was the primary beneficiary of her relationship with Douglas J.

   **Defendants' Answer:    Yes.**

III. Whether the time spent on the tasks that Plaintiffs challenge was *de minimis* or so difficult to track that no compensation is owed under the FLSA and similar state statutes.

   **Defendants' Answer:    Yes.**

## MOST CONTROLLING AUTHORITY

*Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761 (6th Cir. 2018) (holding that for the purposes of the FLSA, whether plaintiffs expected compensation is a "threshold issue" to be decided before applying any other test to assess the economic reality of the relationship)

*Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006 (6th Cir. 2020) (setting forth the legal standard for determining whether students are employees under the FLSA)

*Solis v. Laurelbrook Sanitarium & School, Inc.*, 642 F.3d 518 (6th Cir. 2011) (holding that whether an employment relationship exists in the context of a training or learning situation depends on which party derives the primary benefit from the relationship)

*Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290 (1985) ("[T]he Act reaches only . . . those who engage in [commercial] activities in expectation of compensation.")

*Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947) (FLSA only applies to "every person *whose employment contemplated compensation*," and not individuals "who, without promise or expectation of compensation," worked for the benefit of others) (emphasis added)

# TABLE OF CONTENTS

Page

ISSUES PRESENTED..................................................................................... i

MOST CONTROLLING AUTHORITY ............................................................ ii

TABLE OF AUTHORITIES .............................................................................. v

INTRODUCTION ............................................................................................ 1

    Douglas J's student clinics prepare students for real work experiences ........3

    Douglas J employs individuals to assist with the clinic's operations ............5

    Douglas J student clinic experience ............................................................6

    Plaintiffs' experiences at Douglas J .............................................................8

    Plaintiffs keep contemporaneous records of their clinic time .......................9

PROCEDURAL HISTORY ..............................................................................10

ARGUMENT...................................................................................................13

    I.     Plaintiffs' claims fail because they had no expectation of
          compensation....................................................................................14

    II.    Plaintiffs were the primary beneficiaries of their time in the
          student clinic....................................................................................16

    III.   Plaintiffs benefited from even the alleged "mundane" tasks..............19

          A.    Plaintiffs derived "tangible and intangible" "educational
                 value" from the selected tasks because, consistent with its
                 mission, Douglas J's student clinic emulates a true salon
                 experience...............................................................................20

          B.    Plaintiffs received academic credit for all their clinic time......22

          C.    Plaintiffs' activities were voluntary........................................24

          D.    Plaintiffs did not displace Douglas J's employees, who
                 are hired to clean, do laundry, and restock shelves.................27

Page

IV.     Plaintiffs' time spent on these tasks was *de minimis* and
        impracticable to record .......................................................................30

CONCLUSION ...................................................................................................31

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Acosta v. Cathedral Buffet, Inc.*,
  887 F.3d 761 (6th Cir. 2018) ...................................................................15, 16

*Benjamin v. B & H Education, Inc.*,
  877 F.3d 1139 (9th Cir. 2017) ..........................................................................16

*Chambers v. Sears Roebuck & Co.*,
  428 F. App'x 400 (5th Cir. 2011) ...............................................................30, 31

*Eberline v. Douglas J. Holdings, Inc.*,
  982 F.3d 1006 (6th Cir. 2020) ...................................................................passim

*Guy v. Casal Institute of Nevada, LLC*,
  2019 WL 2192112 (D. Nev. May 21, 2019) ......................................................17

*Hollins v. Regency Corp.*,
  867 F.3d 830 (7th Cir. 2017) ............................................................................16

*Lindow v. United States*,
  738 F.2d 1057 (9th Cir. 1984) ....................................................................30, 31

*Moldowan v. City of Warren*,
  578 F.3d 351 (6th Cir. 2009) ............................................................................23

*Solis v. Laurelbrook Sanitarium & School, Inc.*,
  642 F.3d 518 (6th Cir. 2011) ............................................................................15

*Tony & Susan Alamo Foundation v. Secretary of Labor*,
  471 U.S. 290 (1985) ..........................................................................................15

*Walling v. Portland Terminal Co.*,
  330 U.S. 148 (1947) ....................................................................................14, 15

*White v. Washington Gas*,
  No. CIV.A. DKC 2003-3618, 2005 WL 544733 (D. Md. Mar. 4, 2005)............23

# Statutes

29 U.S.C. § 206 ................................................................................14

Michigan Compiled Laws § 339.601 ................................................... 2

Michigan Compiled Laws § 339.1201 ................................................. 2

Michigan Compiled Laws § 339.1207 ................................................23

Michigan Compiled Laws § 339.1218 ................................................. 2

# INTRODUCTION

The Sixth Circuit remanded for this Court to determine who is the primary beneficiary of the segment of work at issue. The Plaintiffs boasted to the Supreme Court that it is a "near certainty" that this Court "will again grant partial summary judgment" in their favor. (Pls.' Br. in Opp. 3.) Defendants disagree.

First, under binding Sixth Circuit precedent, the FLSA does not apply if Plaintiffs had no expectation of compensation. Plaintiffs unequivocally testified that they did not expect to be paid for *any* time in the clinic. Plaintiffs' FLSA claims fail.

Second, the "segment of work at issue" here is all the time that Plaintiffs spent in the Douglas J student clinics. That is what Plaintiffs challenge in their Complaint and that is the result Plaintiffs sought in opposition to Defendants' summary-judgment motion. Because the time Plaintiffs spent learning in the clinic allowed them to practice their trade, learn how a salon operates, fulfill state requirements, pass their cosmetology exams, and work as cosmetologists, Plaintiffs were the primary beneficiaries of their clinic time.

Third, even if the "segment of work at issue" is cleaning, folding towels, and restocking shelves, each Plaintiff benefitted by engaging in these tasks in the context of learning about real-world salon life. And without this time, they would not have graduated or been able to sit for the cosmetology exam. Moreover, the tasks were voluntary and did not displace any Douglas J employees. Moreover, Plaintiffs'

estimations that they spent a significant amount of time doing these tasks are contradicted by their own contemporaneous records. Plaintiffs see the problem, so they say that they lied on those records, but that does not create a genuine factual issue. Nor can Plaintiffs demonstrate that Douglas J was the primary beneficiary of these tasks, because Douglas J derived no real benefit. In the end, Plaintiffs were not employees and their claims should be dismissed.

## FACTUAL BACKGROUND[1]

Cosmetology schools are heavily regulated. *See, e.g.*, Mich. Comp. Laws §§ 339.601, 339.1201, *et seq.* Bi-annually, Michigan inspects each cosmetology school to ensure compliance with state law, including curriculum requirements, the content of the instruction, and the clinic. Mich. Comp. Laws § 339.1218(1). (*See also* Ex. 1, Romain Decl. ¶¶ 19-26.) State inspectors have never raised concerns regarding Douglas J's curriculum or its application. (Romain Decl. ¶¶ 27-32, Exs. 8-10.) Indeed, based on this Court's summary-judgment ruling, Michigan's Attorney General, representing state regulators, initiated administrative actions against Defendants. (*Id.* ¶¶ 27-30, Ex. 9.) After a thorough investigation, the state dismissed the complaints because no violation occurred. (*Id.* ¶ 31, Ex. 10.)

---

[1] Defendants' initial summary judgment briefing focused on legal arguments upheld by other courts. The Sixth Circuit's opinion requires a much more fact-intensive assessment. Accordingly, Defendants include a more comprehensive factual discussion and record here.

2

**Douglas J's student clinics prepare students for real work experiences**

Douglas J seeks to "provide 'education beyond expectation' by preparing its graduates for careers in cosmetology arts and sciences." (Romain Decl. ¶ 4, Ex. 3 at 6.) Douglas J's instruction focuses on teaching fundamentals and "professional business building skills that are necessary for a well-founded education and preparation for entry-level careers in the salon/spa industry." (*Id.* at 37.)

To that end, Douglas J's clinic salons emulate a true salon setting. (Douglas J Catalog, PageID.312; Zimmerman Dep. 110, PageID.2488; Poxson Dep. 75, PageID.2398; Ex. 2, Zelinski Decl. ¶ 2.) Just like real salons, the student clinics include a retail lobby, guest services, individual cosmetologist stations, shampoo bowls, and a laundry room. (*See, e.g.*, Romain Decl. ¶¶ 12-18.) Short videos showing a walk-through of each student clinic have been provided for the Court's benefit. (*Id.* at ¶ 12; videos available here: Ann Arbor, Grand Rapids, East Lansing.)

Douglas J employs licensed cosmetology instructors to assist and observe the students on the clinic floor, and they grade the students' performance. (Eberline Dep. 97, PageID.2321.) Only Douglas J students provide student clinic services, but these services are provided under the supervision of ever-present instructors. (Poxson Dep. 121, PageID.2410; Ex. 3, McCue Decl. ¶ 5; Ex. 4, Fitzgerald Decl. ¶ 5; Ex. 5, Steward Decl. ¶ 6.)

Each Douglas J student clinic is open to the public. (Douglas J Catalog, PageID.312.) Opportunities to practice on a guest in the clinic depends entirely on how many patrons enter the clinic, so students are not guaranteed a specific number of daily guests. (Zimmerman Dep. 155, PageID.2499; Poxson Dep. 167-68, PageID.2421.) The Douglas J student clinics are generally busy, and while Plaintiffs were attending Douglas J schools, Ann Arbor averaged 173 guests per day, East Lansing averaged 180, and Grand Rapids had 112. (Ex. 6, Tanenbaum Decl. ¶ 11; Romain Decl. ¶ 8.) Students would see an average of 3 to 4 guests per day in Ann Arbor and East Lansing. (Romain Decl. ¶ 8; *see also* Tanenbaum Decl. ¶¶ 11-12 (generally in Ann Arbor "students were booked from the start of their time in the student clinic until the end of the day").) In Grand Rapids, students would see 2 to 3 guests daily. (Romain Decl. ¶ 8.) Night students tended to see more guests because evenings and Saturdays (when night students were present) were busier. (*See, e.g.*, Poxson Dep. 100-01, PageID.2404-05; Weaver Dep. 160-61, PageID.2560.)

Douglas J's students graduate, pass the state cosmetology exam, and find cosmetology jobs at rates that greatly exceed the benchmarks established by its accreditors. (*See, e.g.*, NACCAS Team Report, PageID.1743.) This is a direct result of Douglas J's robust curriculum and instruction. (Weaver Dep. 291-94, PageID.2593.) Practical experience in the student clinic and Douglas J's emphasis on teaching the real-life salon experience, does in fact prepare Douglas J graduates

for work as cosmetologists. (Ex. 7, Barrix Decl. ¶ 2; McCue Decl. ¶¶ 2, 4; Ex. 8,

Spadafore Decl. ¶ 2; Zelinski Decl. ¶ 2.)

**Douglas J employs individuals to assist with the clinic's operations**

In addition to the licensed instructors, discussed above, Douglas J employs

others to operate the clinics for the students' benefit. For instance, Douglas J

employs aesthetic/maintenance personnel. (Romain Decl. Ex. 11; Tanenbaum Decl.

¶ 8.) These employees "ensure the Institute is kept clean and materials including

towels and products are always available." (Romain Decl. Ex. 11.) This includes

laundry, sweeping, dusting, dishwashing, and other general cleaning. (*Id.*;

Tanenbaum Decl. ¶¶ 8, 10.) Douglas J employs also daytime guest-services

personnel to assist clients. (Poxson Dep. 97-98, PageID.2404; Weaver Dep. 66-67,

82-83, PageID.2162, 2166; Guest Servs. Manual, PageID.2738-41; Tanenbaum

Decl. ¶¶ 8, 14; Romain Decl. ¶ 34, Ex. 11.) These individuals are tasked with

scheduling, sales, stocking shelves, and other guest services. (Guest Servs. Manual,

PageID.2738-41; *see also* McCue Decl. ¶ 9; Steward Decl. ¶ 10; Romain Decl. ¶ 34,

Ex. 11.) These employees are not displaced by students. (Romain Decl. ¶¶ 35-36.)

The number of guest-services and aesthetics employees and their hours increase

during those times when Douglas J has more students and more guests. (*Id.*)

Douglas J also contracts with an outside janitorial service to clean each school

six days a week. (Weaver Dep. 111, 182-83, 197-98, PageID.2173, 2565-66, 2569;

*see also* Ex. 9, Spencer Decl. ¶ 9; Steward Decl. ¶¶ 8-11; Tanenbaum Decl. ¶¶ 13-15.) Again, these services are based on the needs of the facility—not the number of students. (Romain Decl. ¶¶ 37-38.) The janitorial schedule and cost are not affected by a student performing a "cleaning" task in the student clinic. (*Id.*; Barrix Decl. ¶¶ 7-9; Steward Decl. ¶ 8; Tanenbaum Decl. ¶ 13-15.)

**Douglas J student clinic experience**

As discussed above, the student clinic and hands-on education is a vital part of the curriculum. In the clinic, students must track their activities to demonstrate completion of the state-mandated numbers and hours performing various applications, like general hair cutting, hair straightening, and sanitation. (Barrix Decl. ¶ 3; Steward Decl. ¶ 4; Zelinski Decl. ¶ 2-3.) Each student is responsible to record their own individual hours and practical applications towards meeting state requirements on a Minimum Practical Application sheet, or MPA. (Romain Decl. ¶¶ 9-10, at Exs. 3-6; Zimmerman Dep. 156-60, PageID.2499-2500; Poxson Dep. 32-33, 106, PageID.2387-88, 2406; Eberline Dep. 133, PageID.2330.) Students understood that the hours and numbers of applications that they recorded will be reported to the state cosmetology board to demonstrate that students are eligible to sit for the cosmetology exam. (Spencer Decl. ¶¶ 2-3; Steward Decl. ¶ 4; Zelinski Decl. ¶ 3.)

Douglas J consistently emphasized the importance of accurately and truthfully completing the MPAs. (McCue Decl. ¶ 3; Fitzgerald Decl. ¶ 4; Barrix Decl. ¶ 3;

Zelinski Decl. ¶ 3; Spadafore Decl. ¶ 3; Spencer Decl. ¶¶ 2-3.) Students were well aware that the MPA was a legal document that had to be accurately maintained by the student. (Fitzgerald Decl. ¶ 4; Spencer Decl. ¶¶ 2-3; Steward Decl. ¶ 4.) Indeed, Douglas J developed an MPA Worksheet Policy, which expressly provides that "[s]tudents are responsible for ensuring that their MPA is correctly filled out." (Romain Decl. ¶ 9, Ex. 3 at 31.) No Douglas J instructor, educator, manager, or other employee told students to falsify their MPA. (McCue Decl. ¶ 3; Fitzgerald Decl. ¶ 4; Barrix Decl. ¶ 3; Zelinski Decl. ¶ 3; Spadafore Decl. ¶ 3; Spencer Decl. ¶¶ 2-3; Steward Decl. ¶ 4; Tanenbaum Decl. ¶ 15 (instructors could lose license).)

Students who took the same programs as Plaintiffs, in the same locations, confirmed that when there were no guests, students had myriad options to practice their skills, including working on mannequins or peers. (McCue Decl. ¶ 6; *see also* Barrix Decl. ¶¶ 4, 7-8; Fitzgerald Decl. ¶ 6; Steward Decl. ¶¶ 5, 7.) Because students had to fulfill the hours and applications to meet state requirements, students were responsible for selecting tasks. (Barrix Decl.¶¶ 4, 7-8; Fitzgerald Decl. ¶ 6; McCue Decl. ¶ 6; Steward Decl. ¶¶ 5, 7.) Instructors encouraged students to use free time to work on mannequins, observe an instructor demonstration, or complete other tasks that were required for graduation. (Tanenbaum Decl. ¶ 7.)

At times, students would also clean their station, clean their tools, clean used shampoo bowls, and help instructors fold towels. (Barrix Decl. ¶ 7; Fitzgerald Decl.

¶¶ 7-8; McCue Decl. ¶¶ 7-8; Spencer Decl. ¶ 4; Steward Decl. ¶¶ 8-9.) Students were not required to clean, restock shelves, or do laundry. (Barrix Decl. ¶¶ 7-9; Fitzgerald Decl. ¶¶ 7-9; McCue Decl. ¶¶ 6-9; Spencer Decl. ¶¶ 4-10; Steward Decl. ¶¶ 8-10.) If a student helped with these tasks, it was voluntary. (*Id.*)

**Plaintiffs' experiences at Douglas J**

Plaintiffs acknowledge several key aspects of their Douglas J education. Plaintiffs admit that they had no expectation of compensation—even tips—for their time at Douglas J. (Eberline Dep. 51, 61-63, PageID.2309, 2312; Poxson Dep. 49-56, PageID.2392-93; Zimmerman Dep. 88, PageID.2482.) Plaintiffs knew Douglas J would not pay them, instead they paid for classroom and clinic instruction. (*Id.*)

Plaintiffs admit the value of their education. They admit their Douglas J education prepared them to pass the cosmetology examination. (Eberline Dep. 51, PageID.2309; Poxson Dep. 26-28, PageID.2386 ("you're being prepared for your state test from the time that you start school"); Zimmerman Dep. 51, PageID.2473 ("the skills that were provided, what you needed to do when you took the state boards, Douglas J provided that in every session . . . .") Each Plaintiff graduated from Douglas J and passed the state exam on the first try. (Eberline Dep. 133-34, Exs. 14, 15, PageID.2330; Poxson Dep. 26, 134, PageID.2386, 2413; Zimmerman Dep. 51-52, PageID.2473.) Zimmerman so valued her Douglas J education that she wrote a recommendation letter for her step-daughter to attend the program *after*

*filing this lawsuit.* (Zimmerman Dep. 56-57, PageID.2474-75; Romain Decl. Ex. 2.)

Plaintiffs also concede that they specifically benefited from the skills learned in the clinic. Plaintiffs acknowledge that in the clinics, they gained skill in the actual practice and execution of providing services to guests. (Poxson Dep. 70, PageID. 2397; Zimmerman Dep. 144-45, PageID.2496-97; Eberline Dep. 71, PageID.2314.) And Plaintiffs recognize that improving their skills in the clinic would result in higher career earnings. (Poxson Dep. 35, PageID.2388; Eberline Dep. 71, PageID.2314.)

**Plaintiffs keep contemporaneous records of their clinic time**

Like all Douglas J students, Plaintiffs tracked their hours and tasks on MPAs. (Zimmerman Dep. 160, PageID.2500; Poxson Dep. 106, PageID.2406; Romain Decl. Exs. 4-6.) Plaintiffs were busy providing services to clients on most days in the clinic. (*See* Romain Decl. Exs. 4-6; Poxson Dep. 171, PageID.2422; *see also* Eberline Dep. 95-96, PageID.2320.) Poxson admitted that she provided services to hundreds of clients while at Douglas J. (Poxson Dep. 82, PageID.2400.) Too many, she thought. (*See* Fitzgerald Decl. ¶ 13.) Eberline had the same reaction. (Tanenbaum Decl. ¶ 12.)

Plaintiffs' MPAs further show that each Plaintiff completed the required practical applications to take the state licensing examination, including the minimum 40 hours practicing sanitation skills. (Romain Decl. Exs. 4-6; Poxson Dep. 89,

PageID.2402.) Plaintiffs' MPAs do not show that they spent 10%, much less 30%, of their time performing cleaning activities. (*See id.*)

Plaintiffs recorded their downtime hours on their MPAs. (*See id.*) Plaintiffs concede they had several options to fill any downtime with practical experience needed to complete their 1,500 hours of state-mandated education. (Eberline Dep. 69-71, PageID.2314; Poxson Dep. 154-55, PageID.2418; Zimmerman Dep. 85-86, PageID.2482.) Among those options were practicing skills on mannequins, practicing on fellow classmates, cleaning tasks, or working on bookwork. (*Id.*) Plaintiffs confirmed that students "regularly" opted to work on fellow classmates and practice the various skills they were learning, including coloring, waxing, and cutting. (Eberline Dep. 69-71, PageID.2314; Zimmerman Dep. 85-86, PageID. 2482.) Eberline recognized that the options available to her during her time in the student clinic—working on the public, classmates, or mannequins—was more beneficial. (Eberline Dep. 71, PageID.2314.) Plaintiffs' MPAs do not evidence the myriad cleaning tasks Plaintiffs now complain of. (*Id.*)

## PROCEDURAL HISTORY

Plaintiffs sued Douglas J alleging violations of the FLSA, Michigan's minimum wage law, and Illinois' minimum wage law. Plaintiffs identified the alleged "work" they are challenging as "each hour that they labored in Defendants' personal services business." (Compl. ¶¶ 71, 79, 86, PageID.17, 18, 20.) In opposition

to Defendants' summary-judgment motion, Plaintiffs reasserted that they were employees for all the time that they "labored" in the clinics. (*See, e.g.*, Pls.' Summ. J. Resp., PageID.2892-95.) And when the Court recognized that they were the primary beneficiary of most of the time they spent in the clinics, Plaintiffs moved for reconsideration. (Pls.' Mot. for Recon., PageID.3579-80.)

On cross motions for summary judgment, the Court granted partial summary judgment to both sides. The Court extracted the time that Plaintiffs estimated that they spent cleaning, doing laundry, and stocking shelves from the parties' educational relationship and did not apply the primary-beneficiary test to those activities. (Op., PageID.3565-71.) The Court concluded that Plaintiffs were employees when performing those particular activities. (*Id.* at PageID.3575.) After applying the primary-beneficiary test to what remained of the parties' relationship, the Court held the Plaintiffs were not employees as to the rest of Plaintiffs' time at Douglas J. (*Id.*)

On appeal, the Sixth Circuit reaffirmed that the "proper approach for determining whether an employment relationship exists in the context of a training or learning situation is to ascertain which party derives the primary benefit from the relationship." *Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006, 1013 (6th Cir. 2020). The court reasoned that the primary-beneficiary test should be applied to cleaning, laundry, and stocking shelves because those tasks arose within the parties' educational relationship. *Id.* at 1013-14.

11

The Sixth Circuit then adopted a "targeted" approach to the primary-beneficiary analysis, and remanded for the Court to apply this test to the segment of work at issue. *Id.* at 1014-19. The Sixth Circuit's targeted approach requires identification of the segment of work for which Plaintiffs seek compensation. *Id.* at 1016-17. The Sixth Circuit did not analyze how to determine what segment of work is at issue, but assumed that the segment here is composed of the tasks identified in Plaintiffs' partial motion for summary judgment. *Id.* at 1018-19.

Once the segment of work is identified, the Sixth Circuit's approach applies the primary-beneficiary test to that segment, not the relationship as a whole. *Id.* at 1017-18. This analysis cannot take a task "out of its context." *Id.* at 1017. So where "the segment of work at issue provides benefits as a result of its place in the educational relationship, [the court should] consider those benefits." *Id.* Those benefits include, at a minimum, whether students received academic credit and the relationship between the activities and the school's curriculum. *Id.*

To decide if Plaintiffs are the primary beneficiaries of the segment of work at issue, this Court must address certain specific factors "like whether the purported employee had an expectation of compensation, derives educational value from the work, or displaces paid employees." *Id.* Other considerations that might "shed light" on who primarily benefitted from the work at issue, include the mandatory or voluntary nature of the tasks, the relationship of the work to the school curriculum

12

and stated mission, the type of work performed in the corresponding real-world commercial setting, and the academic credit received by Plaintiffs for the work. *Id.*

Finally, if the Court determines that the Defendants are the primary beneficiaries of the segmented work, the Sixth Circuit directed that the court should decide whether the activities are "undertaken for *de minimis* amounts of time or are too difficult in practice to record" to be appropriately compensated. *Id.* at 1018.

## ARGUMENT

Based on the test laid out by the Sixth Circuit and binding precedent, there is no genuine issue of material fact that Plaintiffs are not employees under the FLSA and are not entitled to compensation. First, under binding Sixth Circuit precedent, the FLSA does not apply if a plaintiff had no expectation of compensation. Plaintiffs admit that they had no expectation of payment for *any* time spent in the student clinic. Plaintiffs' complaint should be dismissed for this reason alone.

Second, if the Court moves past the threshold inquiry to apply the primary-beneficiary test, Plaintiffs were the primary beneficiaries of the segment of the work at issue. Although Plaintiffs moved for summary judgment only as to certain tasks, Plaintiffs have consistently sought compensation for *all* the time they "labored in Defendants' personal services business," i.e. the student clinics. And Plaintiffs admit that they received value from their education, benefitted from the practical experience, and were prepared to pass the state licensing examination. Plaintiffs

13

were the primary beneficiaries of their time in the student clinics.

Third, even if the clinic context were ignored and the segment of work was limited to cleaning, folding towels, and stocking shelves, Plaintiffs are *still* the primary beneficiaries. Plaintiffs engaged in these tasks in the context of learning about real-world salon life, an essential component of Douglas J's education. By their own admission, Plaintiffs received academic credit for these hours. And without them they would not have graduated. Plaintiffs engaged in these tasks voluntarily. And Douglas J derived no real benefit from these discrete tasks. Plaintiffs did not displace paid employees, reduce Douglas J's payroll, or cut Douglas J's janitorial costs. Accordingly, Douglas J is entitled to summary judgment.

## I. Plaintiffs' claims fail because they had no expectation of compensation.

The FLSA's minimum-wage provisions only apply if Plaintiffs are employees. 29 U.S.C. § 206(a). Plaintiffs can only be employees if they expected compensation from Douglas J while they attended cosmetology school. They indisputably did not. Therefore, the FLSA does not apply and Plaintiffs' claims fail.

The FLSA applies to "every person *whose employment contemplated compensation*," but not to individuals "who, without promise or expectation of compensation," work for their own advantage on the premises of another. *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) (emphasis added). From this, the Supreme Court concluded that if the trainees in *Portland Terminal* had been

enrolled in a "vocational school, wholly disassociated from the railroad, it could not reasonably be suggested that they were employees of the school." *Id.* at 152-53.

The Supreme Court has reiterated the dispositive importance of an expectation of compensation to the existence of an FLSA employment relationship. In *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985), the *only factor* the Court considered to decide if the plaintiffs were employees was whether they expected compensation. *Id.* at 299-302. The Court concluded that because the plaintiffs "must have expected to receive in-kind benefits . . . in exchange for their services," there was an "implied" expectation of compensation. *Id.* at 302. Had this factor turned out the other way, the FLSA would not have applied. *See id.*

The Sixth Circuit too has recognized that whether FLSA plaintiffs expected to be paid speaks definitively to the "economic realities" of the relationship, which is ultimately what the primary beneficiary test is evaluating. *See Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522-23, 525-26 (6th Cir. 2011) (the purpose of the primary-beneficiary test is to assess the economic reality of the vocational-training relationship). In *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761 (6th Cir. 2018),[2] the Sixth Circuit characterized the question of whether an FLSA plaintiff expected to receive compensation as a "*threshold inquiry that must be satisfied* " before a court can apply any multi-factor analysis to "assess the economic realities

---

[2] *Cathedral Buffet* was decided after the initial summary-judgment briefing here.

of the working relationship." *Id.* at 766 (emphasis added). "*Portland Terminal* and *Alamo* plainly require courts to first ask whether plaintiffs worked in 'expectation of compensation.'" *Id.* at 767 (cleaned up).[3]

Here, Plaintiffs cannot get past this threshold. Douglas J does nothing to cause students to think that Douglas J will pay them any time spent in the student clinic. (Poxson Dep. 49-50, Exs. 6, 7, PageID.2392.) Plaintiffs admit as much, and have testified that they never expected to be paid for any of their time in Douglas J's program. (Eberline Dep. 51, 61-63, PageID.2309, 2312; Zimmerman Dep. 88, PageID.2482; *see also* Poxson Dep. 49-56, PageID.2392-93.) Plaintiffs contracted with Douglas J to educate them, train them for licensure, and give them real world experience in cosmetology; not to pay them wages. (*Id.*) In the absence of an expectation of compensation, the FLSA does not apply.

## II.   Plaintiffs were the primary beneficiaries of their time in the student clinic.

Applying the primary-beneficiary test to the time Plaintiffs spent in the clinic also shows that Plaintiffs were not employees. The Sixth Circuit's opinion requires

---

[3] Other circuits have found it bizarre that students who pay to participate in a program without any expectation of compensation would be considered employees under the FLSA. *See Benjamin v. B & H Educ., Inc.*, 877 F.3d 1139, 1147 (9th Cir. 2017) ("[T]here is no dispute that [the] students signed on knowing they would not receive remuneration and did not expect compensation."); *Hollins v. Regency Corp.*, 867 F.3d 830, 836 (7th Cir. 2017) ("[T]he fact that students pay . . . for the practical-training time is fundamentally inconsistent with the notion that . . . the students were employees.").

the court to ascertain the scope of the work at issue by identifying the work for which Plaintiffs seek compensation. *Eberline*, 982 F.3d at 1017. And Plaintiffs have alleged that they are entitled to compensation for *all* of their time in the student clinic. (Compl., PageID.8-9; Pls.' Summ. J. Resp., PageID.2892-95.) *Eberline* does not authorize the courts to consider something less than the entirety of the time for which Plaintiffs seeks compensation. *See* 982 F.3d at 1017.

This Court has already granted summary judgment to Douglas J as to all aspects of Plaintiffs' time in the clinic except the time spent cleaning, folding laundry, and restocking shelves. (Op., PageID.3575.) Summary judgment was (and is) appropriate because Plaintiffs were the primary beneficiaries of their clinical education at Douglas J. Indeed, every court in the country that has decided whether cosmetology students should be paid for time spent in the student clinic has held that the students are the primary beneficiaries of this time. (*See* Mot. to Certify Appeal, PageID.3673-77 (collecting authority).) *See also Guy v. Casal Inst. of Nev., LLC*, 2019 WL 2192112 (D. Nev. May 21, 2019).

As set forth above, the Sixth Circuit provided this Court with several factors to consider in determining whether Plaintiffs are the primary beneficiaries. *Eberline*, 982 F.3d at 1017-18. Applying these factors shows that Plaintiffs were the primary beneficiaries of the time they spent learning on the student clinic floor.

1. Douglas J's mission is to "provide 'education beyond expectation.'"

17

(Romain Decl. ¶ 4, Ex. 3 at 6.) The Douglas J program is not just about giving students information to pass a test, but teaching the cosmetology profession. (*Id.* at ¶ 4.) To achieve this core mission, Douglas J's clinic salons emulate a true salon setting, which Plaintiffs admit. (Douglas J Catalog, PageID.312; Zimmerman Dep. 110, PageID.2488; Poxson Dep. 75-76, PageID.2398; Zelinski Decl. ¶ 2.)

2.    Plaintiffs undoubtedly derived an educational benefit from the practical experience in the clinic. Plaintiffs admit that the student clinic focused on improvement of skills and reinforcement of the needed knowledge to be a successful cosmetologist. (Poxson Dep. 76, PageID.2398; Eberline Dep. 51, 107, PageID.2309, 2323; Zimmerman Dep. 110, PageID.2488.) Instructors would provide feedback on the services Plaintiffs provided, and the feedback was intended to, and did, further that student's skills. (Poxson Dep. 82, PageID.2400; Zimmerman Dep. 38, PageID.2470.) Plaintiffs concede that they gained skill in the actual practice and execution of delivering services to customers. (Poxson Dep. 70, PageID.2397; Zimmerman Dep. 144-45, PageID.2496-97; Eberline Dep. 71, PageID.2314.)

3.    Moreover, Plaintiffs admit that their education at Douglas J prepared them to pass the state cosmetology examination. (Eberline Dep. 51, PageID.2309; Poxson Dep. 26-28, PageID.2386; Zimmerman Dep. 51, PageID.2473.) Indeed, Plaintiffs received academic credit for their time spent in the student clinic, and that credit was necessary to sit for the cosmetology examination. (Poxson Dep. 179,

PageID.2424; Eberline Dep. 113, PageID.2325.) After graduating, each Plaintiff passed the state exam on the first try. (Eberline Dep. 133, Exs. 14, 15, PageID.2330; Poxson Dep. 26, 134, PageID.2386, 2413; Zimmerman Dep. 51-52, PageID.2473.) In sum, Plaintiffs are licensed cosmetologists because of their clinic time.

4.      Only Douglas J students provide services at the student clinic. (Poxson Dep. 120-21, PageID.2409-10.) This is not contested. Neither licensed cosmetologists nor student instructors provide cosmetology services on the clinic floor to the public guests. (Eberline Dep. 96, PageID.2320; Poxson Dep. 121, PageID.2410.) The students thus did not displace paid employees.

Plaintiffs seek compensation for the entire time in the student clinic. But the record evidence is clear—Plaintiffs are not entitled to it.  Plaintiffs were the primary beneficiaries of their educational experience in Douglas J's clinic.

## III.    Plaintiffs benefited from even the alleged "mundane" tasks.

Despite placing the entirety of their time in the salon at issue in their Complaint, Plaintiffs have focused since summary judgment on a few tasks (while still arguing that the rest of the clinic time remains at issue). But even if this Court only assesses the tasks that Plaintiffs raised in their motion for partial summary judgment (laundry, cleaning, and restocking product), the conclusion is the same: Plaintiffs were the primary beneficiaries.

The Sixth Circuit's factors to consider in making the primary beneficiary

determination are addressed below. It is important to note that the primary-beneficiary analysis does not require Douglas J to show that it derived no benefit. Rather, the question is who was the *primary* beneficiary—Plaintiffs or Douglas J.

### A. Plaintiffs derived "tangible and intangible" "educational value" from the selected tasks because, consistent with its mission, Douglas J's student clinic emulates a true salon experience.

Douglas J is not just a cosmetology school that teaches students how to cut hair. Rather, Douglas J believes that its duty is to also teach "professional business building skills that are necessary for a well-rounded education and preparation for entry-level careers in the salon/spa industry." (Romain Decl. Ex. 3 at 6.) Thus, Douglas J's clinic floor was created to "emulate a true salon setting." (*Id.* at 7.) And it does. As seen in each of the clinic videos, just like real salons, the clinic includes a retail lobby for the public guests, guest services, individual cosmetologist stations, shampoo bowls, a laundry room, and the like. (*Id.* at ¶¶ 12-18.)

Students acknowledge that they "learned not only the technical aspects of cosmetology, but also the importance of the guest experience to a successful career." (McCue Decl. ¶ 4; *see also* Barrix Decl. ¶ 2; Fitzgerald Decl. ¶ 3.) Douglas J's focus on the "guest experience in a realistic setting distinguished Douglas J from other cosmetology schools" and prepared students for the "future in the industry." (Barrix Decl. ¶ 2; *see also* Zelinski Decl. ¶ 2; Spadafore Decl. ¶ 2.)

Importantly, cosmetologists are required to keep their real-life salon work

areas clean and sanitized. Thus, as Plaintiffs admit, they were taught sanitation as part of the Douglas J curriculum and state-licensing examination. (Eberline Dep. 104-05, PageID.2322-23; Poxson Dep. 69-70, PageID.2397; Zimmerman Dep. 60-61, 119-20, PageID.2475-76, 2490.) After each customer, students would sweep up hair, clean their respective stations, and sanitize their tools. (Eberline Dep. 119-20, PageID.2326; Poxson Dep. 162-63, PageID.2420; Zimmerman Dep. 121, PageID. 2491.) Eberline even admitted that sanitation skills may not be naturally known to all students at Douglas J, and that students need to be taught to properly perform these tasks. (Eberline Dep. 108, PageID.2323.) Plaintiffs concede that sanitation is an important part of the Douglas J curriculum, and the state examination, and thus they primarily benefited from instruction related to sanitation. (*See, e.g.*, Eberline Dep. 104-05, 108, 119-20, PageID.2322-23, 2326; Poxson Dep. 69-70, PageID. 2397; Zimmerman Dep. 60-61, 119-20, PageID.2475-76, 2490.)

Plaintiffs admit, as they must, that even "cleaning" tasks are tasks performed in real-world salons. (Poxson Dep. 70-71, PageID.2397; Eberline Dep. 115-16, 190-92, PageID.2325, 2344). Plaintiffs agree that just like the student clinic, a real-life salon has down time. Indeed, just like the student clinic, Poxon testified that in a real salon, the number of services on a given day depends on whether the salon is "slow or busy." (Poxson Dep. 10, 15, 20, PageID.2382-84.) Employed licensed cosmetologists do the same things during downtime that Plaintiffs did in the student clinic.

Eberline agreed that in her post-education experience working in real salons, "cleaning of the entire salon, not just the stations, was a needed part of operating such a business." (Eberline Dep. 106, PageID.2323.) Eberline also testified that during her real-world work in salons, she has performed many of the same cleaning tasks that she claims she performed at Douglas J. (*Id.* at 115-16, 190-92, PageID.2325, 2344.) Poxson also agreed that she performed the same tasks for which she now seeks compensation in her real-world salon experiences. (Poxson Dep. 70-71, PageID.2397.)

The same is true for laundry. Eberline testified that in her real-world salon experience after graduation, while a specific person was generally tasked with undertaking laundry, that person was often helped in doing laundry by "whoever had free time." (Eberline Dep. 151-52, PageID.2334.) Eberline testified she still does laundry occasionally at her current salon. (*Id.* at 190, 192, PageID.2344.)

Thus, Plaintiffs obtained tangible and intangible educational value.

### B.      Plaintiffs received academic credit for all their clinic time.

Plaintiffs admit that they received educational credit for all tasks performed at Douglas J, including time spent cleaning, restocking and folding laundry. (Poxson Dep. 179, PageID.2424; Eberline Dep. 113, PageID.2325.) Plaintiffs acknowledge that all time purportedly spent doing these tasks was "credited as time on the clinic floor." (*Id.*) Poxson admits that she received credit for all of the hours she spent at

Douglas J. (Poxson Dep. 92-93, 179 PageID.2402-03, 2424.) Eberline emphasized that "if I was physically clocked in I was getting credit." (Eberline Dep. 113, PageID. 2325.) Had Plaintiffs not received the academic credit they would not have completed the state-mandated 1500-hour curriculum, would not have graduated, would not have sat for the state-licensing examination, and would not have become licensed cosmetologists. Mich. Comp. Laws § 339.1207.

Plaintiffs have sought to multiply the purported benefits to Douglas J by claiming that they spent between 10% and 32% of their clinic time cleaning, restocking, and doing laundry. Their *own* MPAs contradict this claim, and instead show that the Plaintiffs used their clinic time to perform various services and engage in appropriate hours of sanitization activities to ensure public health and safety. (Romain Decl. Ex. 4-6.) To counter their own contemporaneous records, Plaintiffs say that they lied on their MPAs, contrary to Douglas J policy. This claim is dubious, but even if they did, they received credit for it. (Poxson Dep. 179, PageID.2424; Eberline Dep. 113, PageID.2325.) Moreover, these self-serving and unsupported assertions, which contradict Plaintiffs' own signed MPAs that they had submitted to the state, do not save Plaintiffs' claims. Such testimony only amounts to a "scintilla of evidence" which is insufficient to defeat summary judgment. *See Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *White v. Washington Gas*, No. CIV.A. DKC 2003-3618, 2005 WL 544733, at *5 (D. Md. Mar. 4, 2005).

23

### C.    Plaintiffs' activities were voluntary.

Emphasizing that students deserve to "be empowered and engaged to participate in learning activities (theoretical and practical) while receiving hours toward their graduation requirements," instructors are to "[a]lways keep the students engaged and learning something." (Clinic Mgmt. Procedure, PageID.2652.) A list of activities was provided to instructors, which included practical work, styling practice, mannequin competitions, marketing, and general salon aesthetics. (*Id.*) Students select their downtime activities. (McCue Decl. ¶ 6; *see also* Barrix Decl. ¶¶ 4, 7-8; Fitzgerald Decl. ¶ 6; Steward Decl. ¶¶ 5, 7.)

Plaintiffs recognize that, when not servicing a guest, they had several options to use that time to complete their state-mandated 1,500 hours. (Eberline Dep. 69-71, PageID.2314; Poxson Dep. 154-55, PageID.2418; Zimmerman Dep. 85-86, PageID. 2482.) Among those options were practicing skills on mannequins, practicing on fellow classmates, cleaning tasks, or working on bookwork. (*Id.*) Plaintiffs confirmed that students "regularly" opted to work on fellow classmates and practice the various skills they were learning, including coloring, waxing, and cutting. (Eberline Dep. 69-71, PageID.2314; Zimmerman Dep. 85-86, PageID.2482.) Eberline even recognized that the options available to her during her time in the student clinic—working on the public, classmates, or mannequins—taught her "somewhat more" about how to perform them and do so efficiently. (*Id.*)

This is confirmed by other Douglas J students. Downtime varied over time and across students. (McCue Decl. ¶ 6; Fitzgerald Decl. ¶ 6; Barrix Decl. ¶ 6; Spadafore Decl. ¶ 5; Steward Decl. ¶ 7.) Thus, students would review their MPA to see what skill requirements they still needed to complete and would work on progress towards those requirements. (McCue Decl. ¶ 6; Steward Decl. ¶ 5; Tanenbaum Decl. ¶ 7.) At times, students might assist others, clean shampoo bowls, or fold towels. But what the student did in their down time was up to them. (McCue Decl. ¶ 6; Zelinski Decl. ¶ 5 ("No one told me what to do during my downtime; it was my choice how to spend that time."); Spadafore Decl. ¶ 5.) Students were not required to stock product, fold towels, or clean any area of the salon besides their own station. (*See, e.g.*, McCue Decl. ¶¶ 7-9; Fitzgerald Decl. ¶¶ 7-9; Barrix Decl. ¶¶ 7-9; Tanenbaum Decl. ¶¶ 10-11, 16.) If a student assisted with these tasks, it was voluntary. (Barrix Decl. ¶ 6; Fitzgerald Decl. ¶ 6; McCue Decl. ¶ 6.)

Even Plaintiffs admit that they chose to do laundry, cleaning, and restocking shelves in their down time. Zimmerman confirmed that she was not required to undertake cleaning tasks as part of the Douglas J program. (Zimmerman Dep. 127-28, PageID.2492.) The same was true for Poxson, who admits she was not required to do laundry because others were hired to do it. (Poxson Dep. 97-98, PageID.2404.) In fact, one of Poxson's instructors confirmed that Poxson simply did not want to practice her techniques, but rather, preferred to fold the laundry. (Barrix Decl. ¶ 14.)

Eberline and Poxson were placed on academic probation for poor attendance. (Eberline Dep. 122, PageID.2327; Poxson Dep. 102, PageID.2405.) To make up the time they had missed, they volunteered to come into the clinic outside of their normal classes to catch up on applications and hours. (Romain Decl. ¶ 5, Ex. 1; Poxson Dep. 89, 92, PageID.2402.) Eberline specifically wanted to stay after clinic hours "to help clean for however long [she was] permitted." (Romain Decl. Ex. 1.) And Poxson acknowledged also admitted that if she came into the clinic to make up hours, she could work 1 hour, 4 hours, or 7 hours—she had flexibility to leave if there were no guests. (Poxson Dep. 109-10, PageID.2407.)

Plaintiffs' testimony demonstrates that the tasks for which they are now seeking compensation were undertaken voluntarily. In fact, any suggestion that Plaintiffs were mandated to clean for hours is both physically, and logically, impossible. For example, Poxson testified that at times there would be 80 people on the clinic floor. (Poxson Dep. 156, PageID.2418.) She then alleges that students spend two or three hours a day cleaning on slow days (Mondays through Wednesdays). (*Id.* at 168, PageID.2421.) If this were true, each student clinic would need 160 to 240 hours of cleaning, per week. This is simply not credible. The clinic schematics and the clinic videos show the student clinic facilities are not that big. (Romain Decl. ¶¶ 12-18, Ex. 7; *see also* Tanenbaum Decl. ¶¶ 13-15.) It is impossible that 240 hours of cleanings could be done each week.

Students simply would not have time to do such cleaning, while seeing multiple guests a day. As confirmed by the guest-service personnel who worked with Poxson, he never saw her cleaning, folding towels, or restocking shelves. (Fitzgerald Decl. ¶ 14.) Rather, Poxson complained that she was *too busy* and was booked with too many guests. (*Id.* ¶ 13; *see also* Tanenbaum Decl. ¶ 13.)

The suggestion that Plaintiffs had to perform cleaning, laundry, and restocking tasks or risk being sent home is based on a series of hypothetical questions posed to Defendant Scott Weaver regarding students who would not undertake other downtime activities. (Op., PageID.3553 (quoting Weaver Dep. 207, PageID.2572).) But Plaintiffs have presented no testimony that anyone ever told them that they must fold towels or clean or else be sent home. And Plaintiffs' instructors and contemporaries consistently state that they were not directed to clean, fold towels, or stock shelves. (Barrix Decl. ¶12; Fitzgerald Decl. ¶12; McCue Decl. ¶ 12; Spencer Decl. ¶¶ 4, 7, 8, 10; Zelinski Decl. ¶ 12.)

To the extent that Plaintiffs cleaned, folded towels, and stocked shelves, they did so voluntarily. So this factor also weighs against Plaintiffs.

### D. Plaintiffs did not displace Douglas J's employees, who are hired to clean, do laundry, and restock shelves.

Plaintiffs did not displace paid employees, much less do so to Douglas J's competitive benefit in the commercial marketplace. It is undisputed that Douglas J hired employees to perform the complained of activities of cleaning, restocking, and

laundry. Douglas J maintained a staff of paid employees who were responsible for running the clinic, operating the front desk and performing cleaning services through its aesthetic department. (Romain Decl. Ex. 11.) In addition, Douglas J contracted with an outside company to perform janitorial and cleaning services six days a week. (Weaver Dep. 111, 182-83, 197-98, PageID.2173, 2565-66, 2569; *see also* Steward Decl. ¶ 8; Tanenbaum Decl. ¶ 13-15.) Employees were not displaced by services that the students provided in connection with their academic training in the student clinics. Indeed, Poxson admitted that the school had employees that would complete the laundry. (Poxson Dep. 97-98, PageID.2404.) The students might "help," as would instructors. (*Id.*)

Importantly, the number of people Douglas J employed did not change based on the number of students Douglas J had in any given semester. The square footage of the buildings in which the students learned, remained constant, and the areas that needed to be cleaned did too. If students were being used to displace Douglas J employees who provided aesthetic and janitorial services, then the expenses of these positions would logically have fluctuated inversely to the number of students. But they did not, because Douglas J did not rely on students to conduct janitorial services in the buildings. (Romain Decl. ¶¶ 35-38.; *see* Tanenbaum Decl. ¶ 14-15.)

The same is true for laundry and restocking shelves. Douglas J's employee headcount only changed based on the number of clinic guests. (Romain Decl. ¶¶ 35-

38.) Thus, the more towels that needed to be laundered, the more guest-services employees Douglas J hired. Again, the number of Douglas J students had zero impact on these decisions.

Plaintiffs have no evidence to the contrary. Indeed, the record is devoid of any evidence suggesting that students' actions displaced paid employees. Rather, Plaintiffs rely on a statement by Scott Weaver, which Plaintiffs grossly mischaracterize. (Pls.' Summ J. Mot. 28, PageID.2077.) Weaver testified that if students helped guest services that there would, logically, be less "work" for the guest service employee. (Weaver Dep. 214, PageID.2573.) But Weaver did not testify that students' assistance in their free time displaced any paid employee.

No Douglas J students, including Plaintiffs, displaced paid employees to the school's competitive benefit in the commercial marketplace. Thus, this factor, again, weighs in favor of the conclusion that Douglas J was not the primary beneficiary of the Plaintiffs performing these tasks.

***

Application of the *Eberline* factors to the facts of this case show that Plaintiffs obtained benefits from their activities whereas any benefit to Douglas J was insubstantial at best. Thus, Plaintiffs were the primary beneficiaries of all the tasks challenged, and Douglas J is entitled to summary judgment.

**IV.    Plaintiffs' time spent on these tasks was *de minimis* and impracticable to record.**

Even if this Court determined that the work at issue was not for Plaintiffs'

primary benefit, the time is still not compensable. Before concluding that any portion

of work is compensable, this Court "should determine whether the work at issue is

for de minimis amounts of time or is practically speaking too difficult to record."

*Eberline*, 982 F.3d at 1018-19.

When analyzing whether tasks are de minimis or impractical to record, each

individual task for which compensation is being sought should be considered

independently. *Lindow v. United States*, 738 F.2d 1057, 1064 (9th Cir. 1984)

(analyzing multiple pre-shift activities separately); *Chambers v. Sears Roebuck &*

*Co.*, 428 F. App'x 400, 415 (5th Cir. 2011) (analyzing myriad activities separately

and finding them de minimis, even though in aggregate they took 30 minutes).

Here, Plaintiffs claim they undertook a litany of different tasks. But Plaintiffs

have presented no evidence of the amount of time they spent on any one of these

tasks and have provided nothing more than mere speculation as to the aggregate time

they spent doing *all* of the tasks. (Pls.' Summ J. Mot., PageID.2061-63.) This

contention inappropriately lumps several tasks into one, contrary to the analysis

courts undertake. Plaintiffs have not presented any evidence of the time they actually

worked the tasks for which they now seek compensation.

On the contrary, the only record evidence is the Plaintiff's MPAs, which they completed at the time, and documented their time spent on each identified task. Of the required 1,500 total hours in Douglas J's educational program, Plaintiffs MPAs show nominally more sanitation hours than the 40 hours required by the state. (*Romain Decl.*, Exs. 4-6.) Yet despite these—their own contemporaneous records of their actions—Plaintiffs allege significantly more time, without any evidentiary support. Neither Plaintiffs, nor Douglas J, nor this Court, can hunt through the monthly MPAs and track the time, if any, spent on these tasks. Such random tasks are exactly the kind of short one-off tasks that courts have found to be de minimis. *See, e.g.*, *Lindow*, 738 F.2d at 1064; *Chambers*, 428 F. App'x at 415.

## CONCLUSION

For all of these reasons, the Court should grant summary judgment in favor of Defendants.

Dated:  May 21, 2021

Respectfully submitted,
WARNER NORCROSS + JUDD LLP

*s/ Matthew T. Nelson*

| | |
|---|---|
| Michael G. Brady | Matthew T. Nelson |
| Adam T. Ratliff | Amanda M. Fielder |
| 2715 Woodward Avenue, Suite 300 | 150 Ottawa Avenue NW, Suite 1500 |
| Detroit, Michigan 48201 | Grand Rapids, Michigan 49503 |
| 313.546.6000 | 616.752.2000 |
| mbrady@wnj.com | mnelson@wnj.com |
| aratliff@wnj.com | afielder @wnj.com |

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2021 I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system, which will send

notification of such filing to all parties of record. There are no on-ECF participants

to be served.

Dated:  May 21, 2021                    *s/  Matthew T. Nelson*
                                             Matthew T. Nelson