## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Joy Eberline, *et al.*,

|  |  |
|---|---|
| Plaintiffs, | Case No. 14-10887 |
| v. | Judith E. Levy<br>United States District Judge |
| Douglas J. Holdings, Inc., *et al.*, | |
| Defendants. | |

_____/

## ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT [134]

This case returns to this Court after remand from the Sixth Circuit Court of Appeals. On October 1, 2018, the Court issued an opinion and order granting Plaintiffs' motion for partial summary judgment and granting in part and denying in part Defendants' motion for summary judgment. (ECF No. 77.) The Court held that Plaintiffs, former students in Defendants' cosmetology schools, were employees entitled to compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203 *et seq.*, when they clean, do laundry, and restock products during the

clinical training portion of Defendants' curriculum (hereinafter, "janitorial tasks"). (*Id.* at PageID.3543.) However, the Court granted Defendants' motion for summary judgment as to the remaining time and the other portions of the parties' relationship.[1] (*Id.*)

The Court subsequently granted Defendants' motion to certify the summary-judgment order for appeal to the Sixth Circuit under U.S.C. § 1292(b). (ECF No. 105.) In so doing, the Court found that there was no precedent that speaks to whether tasks beyond the pale of the contemplated training or learning situation must be evaluated with the rest of the relationship under the primary benefit test enunciated in *Solis*

---

[1] The Court granted summary judgment to Defendants in part because the Court believed that Plaintiffs no longer disputed that Plaintiffs were not employees at all other times in the clinic program based on Plaintiffs' counsel's representation at oral argument. (ECF No. 77, PageID.3543, 3565; ECF No. 105, PageID.3911.) The parties later agreed that Plaintiffs had not waived their claims for compensation for time spent on activities outside of the general labor and janitorial tasks that were the subject of Plaintiffs' partial motion for summary judgment. On October 15, 2018, Plaintiffs filed a motion for reconsideration on those grounds (ECF No. 78), which the Court denied as moot without prejudice (ECF No. 107) following the certification for interlocutory appeal of the opinion and order regarding the summary judgment motions. (ECF No. 105.) Having been instructed by the Sixth Circuit to apply the primary-beneficiary test as outlined in *Laurelbrook* to the specific work for which Plaintiffs seek compensation, *Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1018–19 (6th Cir. 2020), the Court addresses in this opinion the entirety of the tasks for which Plaintiffs seek compensation under the FLSA: all tasks completed during Plaintiffs' time in the Douglas J clinical setting, including those for which the Court previously granted summary judgment to Defendants.

*v. Laurelbrook Sanitarium and School, Inc.*, 642 F.3d 518 (6th Cir. 2011). (*Id.* at PageID.3913–3916.) The Sixth Circuit, in turn, granted Defendants' request for an interlocutory appeal.

Following oral argument, on December 17, 2020, the Sixth Circuit issued an opinion reversing the Court's order granting partial summary judgment to Plaintiffs and remanding for application of the primary-beneficiary test as outlined in *Laurelbrook* to the specific work for which Plaintiffs seek compensation. *Eberline v. Douglas J. Holdings, Inc.*, 982 F.3d 1006 (6th Cir. 2020). The Sixth Circuit rejected this Court's conclusion that the janitorial tasks at issue fell so far outside of the training or learning situation such that *Laurelbrook*'s primary-beneficiary test did not apply. *Id.* at 1013–14. However, the Sixth Circuit nevertheless found that work performed in educational relationships could be segmented for purposes of an FLSA analysis, such that the primary-beneficiary test as outlined in *Laurelbrook* should be applied only to the segment of work at issue and not the relationship as a whole. *Id.* at 1014. It further declined to reach a conclusion as to which party is the primary beneficiary of the janitorial tasks completed by Plaintiffs and instead outlined factors stemming from *Laurelbrook* that are relevant to

the primary-beneficiary inquiry for this Court to apply on remand. *Id.* at 1018–19.

Now before the Court is Defendants' renewed motion for summary judgment. (ECF No. 134.) Defendants first argue that summary judgment is proper as to all of Plaintiffs' FLSA claims for tasks completed at Douglas J because an individual cannot be considered an employee under the FLSA without an expectation of compensation, a requirement they argue is set forth in *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 766 (6th Cir. 2018). (*Id.* at PageID.4564–4566.) Because Plaintiffs concede that they never expected compensation for their time at the Douglas J school, Plaintiffs' FLSA claims must be dismissed. (*Id.*) Defendants further contend in the alternative that Plaintiffs were the primary beneficiary in all aspects of their relationship with Douglas J: The proper segment of work at issue for evaluation under *Laurelbrook* was any and all time spent on the clinic floor. (*Id.* at PageID.4566–4581.) Additionally, Defendants claim that the time Plaintiffs spent on the challenged tasks was de minimis. (*Id.*)

Plaintiffs disagree, arguing that Defendants' categorical approach based on the FLSA's alleged threshold requirement of an expectation of

4

compensation is contrary to the Sixth Circuit's formulation of the primary beneficiary test. (ECF No. 140, PageID.4696–4700.) Plaintiffs further contend that their time spent in Douglas J's clinic setting should be segmented into three categories of tasks: (1) janitorial tasks; (2) "[a]ll time spent performing services for paying customers" (hereinafter, "client services"); and (3) "[a]ll time spent where Defendants used students as retail salespersons" (hereinafter, "retail sales"). (*Id.* at PageID.4652, 4657, 4661, 4700; ECF No. 147.) While Plaintiffs argue that there is no genuine dispute of fact that Defendants were the primary beneficiaries of the janitorial tasks (ECF No. 140, PageID.4661–4675, 4700), Plaintiffs separately contend that a genuine dispute of fact precludes summary judgment as to the client services and retail sales. (*Id.* at PageID.4675–4683; ECF No. 147.) Plaintiffs request the Court sustain its granting of partial summary judgment on remand. (ECF No. 140, PageID.4658.)

For the reasons set forth below, the Court finds that the proper method of evaluating Plaintiffs' time spent in the Douglas J clinical setting is to segment the work into the three categories as outlined by Plaintiffs. The Court grants in part Defendants' renewed motion for summary judgment because there is no genuine dispute of fact that

5

Plaintiffs are the primary beneficiaries as to the clinic services. (ECF No. 134.) The Court grants partial summary judgment to Plaintiffs because there is no genuine dispute of fact that Defendants are the primary beneficiaries of the janitorial tasks. However, the Court finds that there is a question of fact precluding summary judgment as to the retail sales.[2]

## I.   Background

The facts of the case were covered at length in the Court's prior opinions on the cross motions for summary judgment (ECF No. 77) and Defendants' motion to amend and certify order for interlocutory appeal (ECF No. 105), as well as in the Sixth Circuit's opinion remanding for application of the primary beneficiary test as described therein. *See*

---

[2] Furthermore, the Court's conclusion on Plaintiffs' entitlement to compensation under the FLSA is dispositive as to the remaining state-law claims. (*See* ECF No. 1.) As Defendants correctly note (ECF No. 134, PageID.4540), the state-law claims are coextensive with the FLSA. *Allen v. MGM Grand Detroit, LLC*, 675 N.W.2d 907, 909 (Mich. Ct. App. 2003) (observing that the "[Minimum Wage Law of 1964 ("MWL"), Mich. Comp. Laws 408.381 *et seq.*] parallels the FLSA," with the only difference being the statutes of limitation); *Callahan v. Chicago*, 78 F. Supp. 3d 791, 821 (N.D. Ill. 2015) ("Because the [Illinois Minimum Wage law ("IMWL"), 820 ILCS 105/1 *et seq.*] parallels the FLSA so closely, courts have generally interpreted their provisions to be coextensive, and so have generally applied the same analysis to both.").

*Eberline*, 982 F.3d at 1009–13. Updates to the case's procedural history are included below.

On October 1, 2018, the Court entered an opinion and order granting Plaintiffs' motion for partial summary judgment (ECF No. 60) and granting in part and denying in part Defendants' motion for summary judgment (ECF No. 56). (ECF No. 77.) Following this opinion, the Court held a status conference at which the parties agreed that Plaintiffs had not waived their claims for compensation for time spent on activities outside of the general labor and janitorial tasks that were the subject of Plaintiffs' partial motion for summary judgment. On October 15, 2018, Plaintiffs filed a motion for reconsideration on those grounds (ECF No. 78), which the Court denied as moot without prejudice (ECF No. 107) following the certification for interlocutory appeal of the opinion and order regarding the summary judgment motions. (ECF No. 105.) The case was stayed while the Sixth Circuit considered the appeal.

On December 17, 2020, the Sixth Circuit entered an order and opinion reversing the Court's order granting summary judgment to Plaintiffs and remanding for application of the articulated standard under *Laurelbrook* to the work in question. *See Eberline*, 982 F.3d at

7

1009–13. The mandate followed on March 8, 2021. (ECF No. 112.) Defendants filed a petition for writ of certiorari to the Supreme Court (ECF No. 114), which was subsequently denied (ECF No. 120).

Simultaneously, pursuant to a briefing schedule set by the Court following remand for further proceedings from the Sixth Circuit, Defendants filed a renewed motion for summary disposition and application of the Sixth Circuit's decision on May 21, 2021. (ECF No. 116.) On June 2, 2021, Plaintiffs filed an emergency motion (later corrected) to strike Defendants' renewed motion alongside a motion for sanctions based on Defendants' use of nine affidavits from new witnesses. (ECF Nos. 119, 123.) Plaintiffs also filed a motion to stay the briefing schedule for Defendants' renewed motion, seeking a stay until the Court decided Plaintiffs' corrected emergency motion to strike. (ECF No. 124.)

Following full briefing, on July 7, 2021, the Court granted in part Plaintiffs' corrected emergency motion to strike based on the finding that Defendants did not comply with their disclosure requirements under Federal Rule of Civil Procedure 26 with regard to the nine affidavits; the Court also indicated that it "did not contemplate an expanded record on remand when instructing the parties to submit briefing addressing the

primary beneficiary test as outlined by the Sixth Circuit." (ECF No. 128, PageID.4503.) The Court also struck Defendants' renewed motion and denied Plaintiffs' motion to stay. (*Id.* at PageID.4506–4507.)

On July 9, 2021, Defendants filed an emergency motion for clarification of the Court's July 7, 2021 Opinion and Order and to stay briefing on Defendants' renewed motion for summary judgment. (ECF No. 129.) Before the Court entered a decision on the emergency motion, Defendants filed their renewed motion for summary judgment on July 23, 2021. (ECF No. 134.) Again, after full briefing, on August 4, 2021, the Court entered an opinion clarifying the July 7, 2021 opinion and denying Defendants' emergency motion to stay briefing. (ECF No. 135.) Of note, the Court allowed Defendants to file a supplement to their renewed motion for summary judgment, including an affidavit or declaration from Defendant Scott Weaver for their stated purpose of "provid[ing] background information regarding Douglas J's operations and information necessary to authenticate documents that have already been produced during discovery." (*Id.* at PageID.4619–4620.) Pursuant to the August 4, 2021 opinion, Defendants filed a supplemental brief on August 13, 2021. (ECF No. 137.) Plaintiffs filed a reply to Defendants' renewed

9

motion for summary judgment on August 25, 2021 (ECF No. 140), to which Defendants replied on September 13, 2021. (ECF No. 142.)

Defendants' renewed motion for summary judgment was argued at a hearing on January 31, 2022. Following the hearing, the Court granted Defendants' motion for leave to file a supplemental brief regarding whether *Fegley v. Higgins*, 19 F.3d 1126 (6th Cir. 1994) describes the applicable standard for evaluating whether an employment relationship exists under the FLSA when there are issues of fact to be considered under *Laurelbrook*'s primary beneficiary factors. (*See* ECF Nos. 145–146, 148.) The Court also requested supplemental briefing regarding whether Plaintiffs contended that there is a genuine dispute of fact concerning who was the primary beneficiary of students' work in retail sales, separate from clinical work, and if so, what record evidence was relied on to support that argument. (ECF No. 146.) Plaintiffs filed a timely supplemental brief, to which Defendants responded. (ECF Nos. 147, 149.) In sum, the briefing in this case has been extensive.

## II.   Legal Standard

### A. Summary judgment

10

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

### B. FLSA

Under the FLSA, employers must pay their employees a minimum wage if the employees are "engaged in commerce or in the production of goods for commerce, or . . . employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 206(a); *see also* 29 U.S.C. § 215(a)(2). "Congress passed the FLSA with broad remedial intent." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015) (citing *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 509–11 (1950)). In doing so, Congress intended the FLSA to "correct labor

conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." *Id.* (internal quotations omitted) (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)). Accordingly, "[c]ourts interpreting the FLSA must consider Congress's 'remedial purpose.'" *Id.*

"While the [FLSA] does define the terms 'employee,' 'employer,' and 'employ,' the definitions are exceedingly broad and generally unhelpful." *Laurelbrook*, 642 F.3d at 522 (citations omitted). "Whether an employment relationship exists under a given set of circumstances 'is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes.'" *Fegley*, 19 F.3d at 1132 (quoting *Powell*, 339 U.S. at 528). Instead, "it is the 'economic reality' of the relationship between parties that determines whether their relationship is one of employment or something else." *Id.* (citing *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)); *see also Acosta v. Off Duty Police Servs.*, Inc., 915 F.3d 1050, 1055 (6th Cir. 2019) ("To determine whether a worker fits within this expansive definition, we must look to see whether [the] worker, even when labeled as an 'independent contractor,' is, as a matter of 'economic

reality,' an employee."); *see also Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947)) (finding the employment relationship "is to be determined on a case-by-case basis upon the circumstances of the whole business activity.").

The multi-factor nature of the primary beneficiary test raises the question of whether, if issues of fact exist with respect to at least one of the factors, the Court must nonetheless determine the existence of an employment relationship as a matter of law as set forth in *Fegley*. *See* 19 F.3d at 1132 ("[w]hether a particular situation is an employment relationship is a question of law."). Indeed, the Sixth Circuit's decision remanding the case to this Court cited *Fegley*'s standard, only. *See Eberline*, 982 F.3d at 1012. The Court agrees with Defendants that despite the Sixth Circuit's reference to *Fegley*, it does not fully describe the applicable standard (ECF No. 148, PageID.6214), because FLSA precedent contemplates the possibility that there may be material factual disputes regarding employment status that require resolution by a factfinder. As was explained in a Sixth Circuit decision post-*Fegley*:

Indeed, our cases recognize that courts usually should resolve the issue of FLSA-employment status as a matter of law. *E.g., Fegley*[,] 19 F.3d [at] 1132[]; *Donovan*, 736 F.2d at 1116. Yet, in view of the fact-intensive nature of the "economic reality" test discussed above, we have not demanded rigid adherence to this practice. Rather, we have recognized that material factual disputes regarding employment status may require resolution by a factfinder in close cases. *Imars v. Contractors Mfg. Servs., Inc.*, No. 97–3543, 165 F.3d 27, 1998 WL 598778, at *6–7 (6th Cir. Aug. 24, 1998) (per curiam) (vacating summary judgment to the employer on FLSA claim, finding "mixed results" under the "economic reality" test, and remanding for a trial); *see also Troyer v. T. John. E. Prods., Inc.*, No. 12–1065, 2013 WL 1955892, at *2–3 (6th Cir. May 14, 2013) (affirming the district court's denial of a new trial, following a jury verdict classifying plaintiffs as independent contractors under the FLSA); *Lilley* [v. BTM Corp.], 958 F.2d [746,] 750 n. 1 [(6th Cir. 1992)] (acknowledging, in the ADEA context, that a factfinder should resolve the issue of employment status when genuine disputes of fact inhibit a straightforward application of the "economic reality" test).

These cases sensibly acknowledge that courts eschew summary judgment when presented with genuine disputes of fact, and we do not view them as conflicting with our FLSA precedents properly treating employment status as a question of law.

*Werner v. Bell Fam. Med. Ctr., Inc.*, 529 F. App'x 541, 543 (6th Cir. 2013);

*see, e.g., Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988)

("The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law."); *see also*

*Keller*, 781 F.3d at 816 ("Summary judgment for the defendant is not appropriate when a factfinder could reasonably find that a FLSA plaintiff was an employee."); *see also id.* at 806 (quoting *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000)) ("The relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'").

## C. Instructions on remand

The Sixth Circuit remanded to this Court with the following guidance:

> We conclude that when a plaintiff asserts an entitlement to compensation based only on a portion of the work performed in the course of an educational relationship, courts should apply the primary-beneficiary test we laid out in *Laurelbrook* only to that part of the relationship, not to the broader relationship as a whole. ***
>
> [W]e remand to the district court to apply the primary-beneficiary test to the plaintiffs' motion for partial summary judgment as described herein. This will allow the district court to consider the multitude of factors relevant to the primary-beneficiary inquiry in this case. Under *Laurelbrook* these include: the plaintiffs' lack of expectation of payment; the educational value, both tangible and intangible, of the tasks under scrutiny; and the displacement of paid employees to the school's competitive benefit in the commercial marketplace, *see* 642 F.3d at 522, 529, 531; as well as any other considerations that may "shed light on which party primarily

15

benefits from the relationship," *id*. at 529. Such additional considerations might include: the mandatory or voluntary nature of the tasks; the relationship of the work at issue to the school curriculum, state regulations, and the school's stated mission and educational philosophy; the type of work performed in the corresponding real-world commercial setting; and the academic credit received by the plaintiffs for the work. Additionally, before concluding any portion of plaintiffs' work for Douglas J is compensable, the district court should determine whether the work at issue is for de minimis amounts of time or is practically speaking too difficult to record. *Aiken* [*v. City of Memphis*], 190 F.3d [753,] 758[ (6th Cir. 1999)].

*Eberline*, 982 F.3d at 1014.

## III.  Analysis

As a preliminary matter, Defendants' claim that Plaintiffs' lack of an expectation of compensation for their clinic time bars application of the FLSA as a threshold matter is without merit. Next, Defendants' assertion that Plaintiffs' entire time in the clinic is not divisible and is the only proper segment of work to be evaluated under the primary-beneficiary test is also without merit. Additionally, analysis of the primary-beneficiary test as applied to the three segments of work for which Plaintiffs seek compensation leads to the conclusion that (1) no reasonable jury could find that Plaintiffs were the primary beneficiaries of the janitorial tasks; (2) no reasonable jury could find that Defendants were the primary beneficiaries of the clinic services; and (3) summary

judgment for Defendants is not appropriate regarding the retail sales tasks, because a factfinder could reasonably find that Plaintiffs were employees when completing those tasks.

### A. Plaintiffs' lack of an expectation of compensation for their clinic time does not bar application of the FLSA as a threshold matter.

Defendants contend that Plaintiffs' complaint should be dismissed in its entirety because Plaintiffs had no expectation of compensation for their time in the clinic. (ECF No. 134, PageID.4564–4566; ECF No. 142, PageID.6181–6182.) In support, they point to *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947) and *Alamo Foundation*, 471 U.S. at 290, but mostly rest their claim on the Sixth Circuit's decision in *Acosta*, 887 F.3d at 766, which was decided after the initial summary judgment briefing in this case. According to Defendants, *Cathedral Buffet* stands for the proposition that a plaintiff's expectation of compensation is dispositive to the existence of an FLSA employment relationship in all circumstances. (*Id.* at PageID.4565.) Specifically, "the question of whether an FLSA plaintiff expected to receive compensation is a '*threshold inquiry that must be satisfied*' before a court can apply any multi-factor analysis to 'assess the economic realities of the working

17

relationship.'" [*Cathedral Buffet*, 887 F.3d.] at 766 (emphasis added)." (*Id.*) Because Plaintiffs admit that they never expected to be paid for their time in the clinic, the argument goes, the FLSA does not apply, and dismissal is proper. (*Id.* at PageID.4565–4566.)

There are many problems with Defendants' argument. Crucially, the Sixth Circuit—which considered the interlocutory appeal in this case after its decision in *Cathedral Buffet*—did not address that line of inquiry, let alone cite *Cathedral Buffet*. Indeed, as Plaintiffs note (ECF No. 140, PageID.4697), the Sixth Circuit explicitly included expectation of payment as *one* of the factors to be considered by the Court on remand as part of the segmented primary-beneficiary test. *See Eberline*, 982 F.3d at 1018–19. If the lack of expectation of compensation was dispositive or otherwise a threshold issue, it only stands to reason that such a requirement would be emphasized. The Sixth Circuit's silence is indicative, perhaps dispositive.[3]

---

[3] At the hearing on Defendants' renewed motion for summary judgment, Defendants argued that absence of discussion of *Cathedral Buffet* in the Sixth Circuit's opinion requiring remand to this Court was immaterial, because the Sixth Circuit panel in *Eberline* was bound by the earlier published opinion in *Cathedral Buffet*. *See* 6 Cir. R. 32.1(b); *see also Priorities USA v. Nessel*, 860 F. App'x 419, 420–21 (6th Cir. 2021). The Court need not consider the impact of Sixth Circuit Rule

18

Additionally, Defendants' reading of *Cathedral Buffet* is a misstatement of the guiding principles underlining that decision. *Cathedral Buffet* considered whether volunteers at a church-run restaurant were entitled to compensation for doing the same restaurant-related tasks (e.g., cleaning, washing dishes, managing the cash register) as those that were completed by paid employees. *Cathedral Buffet*, 887 F.3d at 763. Defendants' briefing did not include the entirety of the crucial passage of *Cathedral Buffet*, which states: "We agree that a *volunteer's* expectation of compensation is a threshold inquiry that must be satisfied before we assess the economic realities of the working relationship." *Id*. at 766 (emphasis added). Indeed, the Sixth Circuit goes on to emphasize the language in *Portland Terminal*, 330 U.S. at 152, that defined a *volunteer* as one who works without promise or expectation of compensation as well as the reiteration of the test in *Alamo*, 471 U.S. at 302, as applied to religious organizations undertaking a commercial endeavor. *Cathedral Buffet*, 887 F.3d at 766–67. While recognizing that the "case-by-case basis" analysis of past cases did not explicitly discuss a

---

32.1(b), nor whether Defendants' argument implicates law-of-the-case doctrine concerns, because the Court finds that *Cathedral Buffet* is inapplicable here.

threshold question of whether the workers expected to receive compensation, the Sixth Circuit indicated that these former cases "dealt with the distinction between employees and independent contractors" where "it is a foregone conclusion that the workers, whether employees or independent contractors, expect to receive compensation." *Id*. Ultimately, in support of the finding that the volunteers in *Cathedral Buffet* were not employees under the FLSA, the Sixth Circuit emphasized that "it is undisputed that the volunteers were not economically dependent upon Cathedral Buffet in any way. . . . The volunteers neither expected nor received any wages or in-kind benefits in exchange for their service." *Id*. at 767. Because "there was no economic relationship between the restaurant and the church member volunteers[,] . . . the threshold remuneration requirement fails." *Id*.

Just as the Sixth Circuit explicitly distinguished between volunteers, employees, and independent contractors in *Cathedral Buffet*, in this case, the Sixth Circuit implicitly distinguishes students in an education environment further still as part of the economic reality test. To do otherwise would effectively eradicate the primary-beneficiary test in its entirety: why go through the trouble of analyzing who primarily

20

benefitted from the relationship or the segments of work within it if there was never an expectation of wages and that alone was dispositive for FLSA entitlement?

Applying a threshold expectation of compensation requirement would also contravene the purpose of the FLSA and the inherent rationale for the segmented primary-beneficiary test as recognized by the Sixth Circuit: Avoiding "the potential of zones of exploitation in which schools could use their students in place of paid employees to complete work unrelated to the educational purpose of the program, so long as the amount of extra work was not so large as to render the school the primary beneficiary of the overall relationship." *Eberline*, 982 F.3d at 1016. Were an FLSA relationship dependent on an expectation of compensation, schools could easily exploit students—who generally do not expect compensation—in the exact manner contemplated by the Sixth Circuit. Plaintiffs put it well: "Students at vocational schools seldom expect to be paid wages for work they perform at the direction of their instructors, but also do not have an expectation that they will be required to do manual labor unrelated to their education or be required to do tasks where their

education is subverted to the profit-making goals of the school's owner."
(ECF No. 140, PageID.4699.)

Furthermore, as Plaintiffs note, Plaintiffs did expect
"'compensation' for their activities on the clinical floor in the form of
educational value and professional skill building" and "paid high tuition
rates for the prospect of obtaining these skills." (ECF No. 140,
PageID.4699.) While Defendants encourage the Court to view *Cathedral
Buffet* as defining compensation as "payment in exchange for labor[,]"
arguing without explanation that "[t]uition is very different[,]" this
argument contradicts the language of *Cathedral Buffet*. (ECF No. 142,
PageID.6182.) Rather, *Cathedral Buffet* emphasizes that the plaintiff
volunteers "were not economically dependent upon Cathedral Buffet in
any way" and "there was no economic relationship" between them and
the restaurant. *Cathedral Buffet*, 887 F.3d at 767. That is clearly not the
case here. Plaintiffs and Defendants had an economic relationship in the
form of tuition payment for Defendants' vocational program and where—
as the Court previously recognized in its opinion on the motions for
summary judgment and as the Sixth Circuit further emphasized in

22

*Eberline*[4]—Plaintiffs "needed to complete the program and obtain a license to practice cosmetology in order [to] work in their chosen profession and pay off their loans." (ECF No. 77, PageID.3573.) Plaintiffs were thus unequivocally economically dependent on Defendants. Accordingly, *Cathedral Buffet* does not impact the Court's analysis here, which requires consideration of the primary-beneficiary test as outlined on remand to the segments of work at issue.

## B. The Sixth Circuit's opinion requiring remand contemplated application of the segmented primary-beneficiary approach to require segmenting tasks.

Having concluded that there is no threshold requirement that Plaintiffs had an expectation of compensation for their work in the clinic

---

[4] The Sixth Circuit's decision in *Eberline* recognized this same dynamic as justification for applying the primary-beneficiary test in a segmented approach:

> Here, because of Michigan's occupational licensing requirements, schools like Douglas J are an access point through which a person who wants to make a living as a cosmetologist must pass. To the students, then, the benefit of attending cosmetology school is not merely academic, it is a statutory requirement they must fulfill before they can work in their chosen profession. Douglas J's approach would let a school extract uncompensated labor from students that is noneducational so long as the value of that labor to the school does not exceed the value of the overall relationship to the students. But the benefit to the student is being able to work at all. In other words, this approach could lead to the type of exploitation that the FLSA was designed to combat.

982 F.3d at 1016–17.

overall, the question remains as to how to properly implement the primary-beneficiary test as laid out in *Eberline*. Specifically, there is a question of scope.

In essence, Plaintiffs seek to split the analysis of the students' activities in the clinic setting into three categories: (1) the janitorial tasks; (2) client services; and (3) retail sales. (ECF No. 140, PageID.4652, 4657; ECF No. 147.) According to Plaintiffs, there is no genuine dispute that Defendants were the primary beneficiaries of category one, whereas there is a genuine dispute as to who was the primary beneficiary for categories two and three. (*Id.*) Defendants disagree, contending both that the proper scope for the Court's analysis is to consider *all* of Plaintiffs' time in the student clinic (because that is the segment of work at issue outlined in Plaintiffs' complaint) and that there is no genuine dispute that Plaintiffs were the primary beneficiaries of this clinic work in its entirety. (ECF No. 134, PageID.4566.) Defendants further argue that even were the Court to assess only the first category outlined by Plaintiffs (i.e., janitorial tasks), Plaintiffs nonetheless were the primary beneficiaries of those activities. (*Id.* at PageID.4569–4579.)

Defendants are incorrect to the extent they claim that "*Eberline*[, 982 F.3d at 1017] does not authorize consideration of something less than the entirety of Plaintiffs' clinic time." (ECF No. 134, PageID.4566.) When deciding *Eberline*, the Sixth Circuit was fully aware of the procedural posture in this Court, including that the opinion on appeal addressed Plaintiffs' motion for *partial* summary judgment and that Plaintiffs pursued a motion for reconsideration of the Court's granting of summary judgment to Defendants for the other facets of student labor in the clinic setting. Despite this background knowledge, there is no explicit requirement in *Eberline* limiting the Court on remand to review work done in the entirety of the clinic setting—without further subdivision—under the primary-beneficiary test. Nor does *Eberline* suggest or require that the complaint serve as the sole source for outlining the scope of the challenged labor; Defendants thus read this requirement into the text of the opinion.

Furthermore, Plaintiffs' three-part categorization of activities for review also does not pose issues based on the logic of *Eberline*. Ultimately, the Sixth Circuit "conclude[d] that when a plaintiff asserts an entitlement to compensation based only on a portion of the work

performed in the course of an educational relationship, courts should apply the primary-beneficiary test we laid out in *Laurelbrook* only to that part of the relationship, not to the broader relationship as a whole." 982 F.3d at 1014. The Sixth Circuit alternatively refers to the challenged portion of work performed as either "the segment of work at issue" (*id.*) or "the activities for which their status as employees was in dispute." (*Id.* at 1015.) Defendants' argument equates segment of work at issue with that defined in the complaint. But Plaintiffs have limited their claims to only a portion of the work as part of the educational relationship; they have just done so three times, for different sets of activities. Defendants have offered no rationale for why the segment of work at issue does not equate to the activities in dispute; indeed, the Sixth Circuit appears to use the terms largely if not entirely interchangeably.

To the extent Defendants claim that proceeding otherwise would allow "chicanery," this argument is without merit. (ECF No. 142, PageID.6183–6184.) Proceeding in this form of analysis does not "allow plaintiffs to alter the segment of work at issue depending on the procedural posture of the case[.]" (*Id.* at PageID.6183.) Defendants did not have to "wait for years to find out what 'segment of the work' is at

issue." (*Id.* at PageID.6184.) Plaintiffs' complaint identified the time in the clinic broadly as that for which they sought compensation, and the three categories of tasks that they now have identified are those from within the clinic setting. The universe of tasks for which Plaintiffs seek compensation has remained constant since Plaintiffs' first filing. For similar reasons, Plaintiffs have not amended their complaint through arguments in their response to Defendants' renewed motion for summary judgment. Accordingly, the Court will consider the three separate categories of tasks for which Plaintiffs seek compensation.

### C. No reasonable jury could find that Defendants were the primary beneficiaries of the janitorial tasks.

Evaluation of the primary-beneficiary factors and "additional considerations" that "may shed light on which party primarily benefits from the relationship" as identified in *Eberline* leads to the conclusion that Defendants were the primary beneficiary of janitorial tasks in the clinic setting. 982 F.3d at 1018 (internal quotation marks and citation omitted). Because no reasonable jury could find otherwise, Plaintiffs are entitled to summary judgment on this ground.

### a. Plaintiffs' lack of expectation of payment

27

The first factor for consideration is Plaintiffs' lack of expectation of payment. There is no dispute that Plaintiffs did not expect monetary compensation, even in the form of tips, for any work conducted through the Douglas J program.[5] (ECF No. 134, PageID.4557; ECF No. 140,

---

[5] At the hearing on Defendants' renewed motion for summary judgment, Plaintiffs argued for a different characterization of this factor, oriented in terms of chronology. Specifically, Plaintiffs contended that the students at Douglas J had no way of knowing before starting the program that they would be required to engage in janitorial tasks as part of their time in the clinic; only after paying tuition, and starting school, did they become aware. Plaintiffs argued that this factor should thus not weigh in terms of finding Plaintiffs as the primary beneficiaries of the janitorial tasks, because Plaintiffs did not knowingly or impliedly consent to engage in such work, unpaid, before being required to pay Douglas J tuition. Thus, the argument goes, Plaintiffs could not have formed an expectation regarding compensation about work that they did not expect to have to do.

The Court appreciates that Plaintiffs' interpretation of this factor acknowledges the economic dependence resulting from tuition payments to Douglas J, and the fact that cosmetology schools like Douglas J are a necessary gateway to engaging in work as a cosmetologist. However, the Court declines to follow Plaintiffs' interpretation of this factor. To start, the Sixth Circuit's language suggests that this factor is meant to capture situations in which a student participates in an educational setting with the understanding (contractual or otherwise) that they will be compensated for particular work as part of that educational experience, but instead are denied compensation. *See Eberline*, 982 F.3d at 1010 ("Students sign an enrollment agreement with the school that does not include any mention of students being compensated for any of their time spent in salons, or for any other portion of their relationship with Douglas J. The plaintiffs in this case did not expect to be paid by Douglas J during their time at the school."). Adopting Plaintiffs' interpretation of this factor also poses possible issues: For example, it is unclear what the relevant point of time would be in which to evaluate a student's expectation of the work they would undergo in the educational environment. Courts would also need to evaluate whether to analyze the student's

PageID.4699.) Accordingly, this factor leans in favor of finding Plaintiffs as the primary beneficiaries of the janitorial tasks. Nevertheless, as set forth above, this factor is not dispositive.

### b. The educational value, both tangible and intangible, of the tasks under scrutiny.

The second factor for consideration is the educational value, both tangible and intangible, of the tasks under scrutiny. As Plaintiffs' response notes, Plaintiffs testified that they derived no educational benefit from these janitorial tasks, there was no supervisor instruction or classroom component regarding these tasks, and that mechanisms behind completing the tasks were common sense. (ECF No. 140, PageID.4664; ECF No. 140-6, PageID.4782 – 4783, 4788; ECF No. 140-7,

---

expectations on the work they were to do, and whether it would be paid, based on a subjective or objective standard.

Furthermore, reference to the underlying purpose of the primary beneficiary test in the context of educational relationships reaffirms the Court's interpretation. The test is limited to educational relationships, a context wherein students (typically) do not expect compensation for the work undertaken in that educational setting. As the Sixth Circuit noted, the segmented approach seeks to compensate "labor that—although related to the educational relationship in an attenuated way—does not actually provide a benefit to students that exceeds the benefit of free labor received by the school." *Eberline*, 982 F.3d at 1017. It logically follows that the expectation of compensation factor seeks to account for those scenarios in which a student undergoes labor that does not provide an educational benefit with the expectation that it would be compensated, who is then denied payment.

PageID.4871–4872; ECF No. 140-8, PageID.4952–4953.) Accordingly, Plaintiffs assert there was no educational value in any form derived from completion of the janitorial tasks.

Defendants spend a significant portion of their renewed motion highlighting Defendants' educational emphasis on the importance of the guest experience and sanitation. (ECF No. 134, PageID.4570–4572.) Yet this falls afoul of the Sixth Circuit's directive that "[t]he district court should not . . . consider benefits that come from a different part of the broader relationship that is not connected to the work at issue." *Eberline*, 982 F.3d at 1017. Indeed, the objections of Douglas J's catalog relating to guest experience as highlighted by Defendants (e.g., respecting the need to deliver excellent service for the value received, developing effective communication skills for guest interactions, and developing consultation skills to make proper recommendations for guest's needs) do not in any way relate to janitorial tasks. (ECF No. 134, PageID.4571.) Furthermore, Defendants' reply implicitly recognizes that "sanitation" (as a part of the Douglas J curriculum and the state examination) is different in kind from the janitorial tasks at issue. (*See* ECF No. 142, PageID.6185) ("Just like Douglas J's curriculum, Michigan Administrative Code R 338.2173

30

requires that sanitation *and salon management* be taught to students. The tasks that Plaintiffs now challenge are a crucial part of the processes for running a salon and helping others to make it run smoothly.") (emphasis in original).

Ultimately, Defendants' relevant contention is that the janitorial tasks provided intangible educational value *because* they are an aspect of salon management performed in real-world salons, and Douglas J's educational program is based on emulating a real-world setting. (ECF No. 134, PageID.4572–4573; ECF No. 142, PageID.6185.) Defendants also argue that the tasks taught students how to be a "team player[,]" which is a crucial component of real-world salon experience. (ECF No. 142, PageID.6185.)[6]

---

[6] Defendants cite the following portion of Plaintiff Eberline's testimony in support of their contention that janitorial tasks taught students teamwork:

> Q. What is the name of the salon you're currently at?
> A. It's Raydiance. We call it Raydiance.
> Q. Whose job duty is it to do the sweeping of the common areas?
> A. The receptionist.
> Q. Who takes care of the guest area at that salon?
> A. The receptionist.
> Q. And who does the restocking of product at that guest area?
> A. Well, we're not a typical salon, so we don't have like a retail area.
> Q. Okay. Fair enough. Whose job duties is it to do the laundry at that salon?
> A. The receptionist.

31

Defendants' argument is not compelling. The key inquiry for this factor is the educational value of the tasks themselves, and inherent to this is the question of whether Plaintiffs *learned something*. Defendants do not challenge Plaintiffs' testimony that common sense is all that is necessary to complete the janitorial tasks (e.g., it was assumed by the supervisor that it was common sense to know how to sweep) and that Plaintiffs did not learn anything about such work that is unique to working in cosmetology through Douglas J. (ECF No. 60-27, PageID.2334.) There was no tangible educational benefit to students.

---

Q. Now, at JCPenney's I think you said there was a janitorial maintenance person?
A. Correct.
Q. And they had the responsibility, at least it was their job duty, to do the sweeping?
A. Correct.
Q. And keep the place clean in the common areas?
A. Right.
Q. Was there also a laundry service?
A. No, there was not a laundry service.
Q. Who generally did the laundry at JCPenney?
A. Whoever had free time but mostly the manager would do it when she was on schedule.
Q. Is it fair to say at your current salon when you're doing the sweeping, you're helping out the receptionist?
A. Yes.

(ECF No. 60-27, PageID.2334.)

Nor was there an intangible benefit here. In any educational setting, the students bring aptitudes with them to that setting that they might employ during their education. However, simply using those already-acquired skills in an educational setting does not necessarily make them a feature of a student's education or result in an intangible benefit. In some settings, it may: the Court's analysis from its initial opinion on the first round of motions for summary judgment remains applicable here. In *Laurelbrook* and the other cases previously cited by Defendants, the manual "labor at issue in those cases was deeply intertwined with the schools' educational mission and curriculum, and reflected the religious values that were a fundamental part of each institution[.]" (ECF No. 77, PageID.3571.) In *Laurelbrook*, for example, the students were found to have received intangible benefits through learning about "responsibility and the dignity of manual labor[,]" as supported by parent, employer, and alumni testimony. *Laurelbrook*, 642 F.3d at 531. Yet, as before, "Defendants still present no evidence showing that the manual labor here, cleaning, doing laundry, and restocking products, is similarly so crucial and steeped into their educational mission and curriculum." (*Id*.) Nor have Defendants offered evidence that

33

could support the conclusion that Plaintiffs received intangible benefits regarding skills like managing a salon or working in a team-based environment. Accordingly, this factor favors finding Defendants as the primary beneficiaries of the janitorial tasks.

### c. The displacement of paid employees to the school's competitive benefit in the commercial marketplace.

The third factor for consideration is the displacement of paid employees to the school's competitive benefit in the commercial marketplace. The parties agree that Defendants hired employees to perform the janitorial tasks at issue, including: (1) "a staff of paid employees who were responsible for running the clinic, operating the front desk and performing cleaning services through its aesthetics department[;]" and (2) workers engaged through a contractual arrangement "with an outside company to perform janitorial and cleaning services six days a week." (ECF No. 134, PageID.4578; *see also* ECF No. 140, PageID.4673.) Defendants argue that these employees were not displaced by students' work in the clinic. (ECF No. 134, PageID.4577–4579.) In support, Defendants highlight that there is no evidence indicating an inverse relationship between the number of employees hired to perform the janitorial and aesthetics tasks and the

number of students in any given semester. (*Id.* at PageID.4578–4579.) Considering that the areas that required cleaning remained constant each semester, were students displacing employees, "then the expenses of these positions would logically have fluctuated inversely to the number of students. But they did not." (*Id.*)

Defendants' argument could be correct, but it assumes too much without evidentiary support. One could imagine that a greater number of students in the program would result in more common areas being used more regularly, requiring more cleaning to be completed in general—but this would be counterbalanced by having more students present to do the janitorial tasks at issue. In that scenario, it would make sense to have the number of employees hired remain constant regardless of the number of students in the program. Additionally, Defendants' depiction assumes that it would be necessary to hire more employees to do janitorial and aesthetics tasks, as opposed to changing the degree to which these same hired employees would need to complete a greater number of cleaning tasks with the same work time and personnel. Without metrics by which to measure the cleaning output of hired employees or the amount of space required to be cleaned per each

student's use of common space, Defendants' proposed relationship is just a proposal at best.

Rather, Plaintiffs' contention makes logical sense. (ECF No. 140, PageID.4673–4674.) Completing these janitorial tasks was a shared role among students: Plaintiff Eberline indicated that "we all were supposed to. . . partake in these [general cleaning] things." (ECF No. 140-6, PageID.4790.) There is no evidence suggesting that these janitorial tasks were unnecessary to Douglas J such that they do not need to be completed; were students not doing such janitorial tasks, *someone* else would be required to do so. Furthermore, unlike *Walling*, the students at Douglas J do the janitorial tasks themselves and do not simply watch or only slightly contribute to the work of their instructors. *Walling*, 330 U.S. at 149–50 ("[The student applicant's] activities do not displace any of the regular employees, who do most of the work themselves, and must stand immediately by to supervise whatever the trainees do. The applicant's work does not expedite the company business, but may, and sometimes does, actually impede and retard it"). Nor would having employees complete the student's janitorial tasks run counter to the purpose of Douglas J as a cosmetology school, as in *Laurelbrook. See* 642 F.3d at 520

36

("The Sanitarium is staffed such that if the students were not training there, staff members could continue to provide the same patient services. But since the Sanitarium is integral to the education the school provides, Laurelbrook would not operate the Sanitarium if the school did not exist. . . . Therefore, the district court reasoned, students do not displace adult workers or other employees who might be willing to work at the Sanitarium."). Plaintiffs point to Defendant Scott Weaver's testimony that having students assist guest services would result in less work to be completed by guest services personnel. (See ECF No. 60-34, PageID.2573; ECF No. 134, PageID.4579; ECF No. 142, PageID.6189.) Accordingly, Plaintiffs are correct that were students not performing these janitorial tasks, "more work would fall on Aesthetics and Guest Services personnel . . . [and] also fall on paid instructors and potentially contractors as well." (ECF No. 140, PageID.4674.)

Despite the logical rationale of Plaintiffs' argument, Defendants argue that "[t]o demonstrate that [Plaintiffs] displaced workers, they must proffer evidence that they performed enough work to displace any employee." (ECF No. 142, PageID.6189.) Yet Defendants have not pointed to precedent suggesting that the total work completed by

37

students must *equate* to that of an employee, and there is at least a suggestion that needing employees to work overtime is enough. *See Laurelbrook*, 642 F.3d at 527 (evaluating the analysis regarding employee status of students in *Marshall v. Baptist Hosp., Inc.*, 473 F. Supp. 465, 473 (M.D. Tenn. 1979), *rev'd on other grounds*, 668 F.2d 234 (6th Cir. 1981)), to note that the students displaced employees because "the hospital would have had to hire more employees or require its regular employees to work overtime" without the students' work). Accordingly, this factor leans in favor of finding Defendants as the primary beneficiaries of the janitorial tasks.

### d. The mandatory or voluntary nature of the tasks.

The fourth factor for consideration is the mandatory or voluntary nature of the tasks. Analysis of this factor requires understanding the system in which students were to approach their time in the clinic setting. The clinical management procedure manual directed instructors to "[a]lways keep the students engaged and learning something." (ECF No. 60-37, PageID.2652.) Instructors were given a list of possible activities, of which the cleaning tasks were options, as ideas for students to do during downtime. (*Id.*; ECF No. 60-34, PageID.2572.) Other options

38

included styling practice, mannequin competitions, and marketing. (*Id*.) However, multiple documents directed instructors to have the students clean, do laundry, and restock products during downtime or periods where there were not enough guests to keep students busy during clinic time. (ECF Nos. 140-9–140-11, 140-13–140-14.)

Plaintiffs' testimony suggests that, while they did not exclusively clean during downtime, it was often implicitly or explicitly required. Plaintiffs testified that they did work on mannequins, perform services for classmates, and work on book-work at points during their downtime. (ECF No. 60-27, PageID.2314; ECF No. 60-28, PageID.2418; ECF No. 60-29, PageID.2482.) However, contrary to Defendants' characterization (ECF No. 134, PageID.4576), they did not testify that they opted to do so; rather, they testified that they did do so. In contrast, Plaintiff Poxson testified that the instructor would be the one to direct students to either clean or work on mannequins. (ECF No. 60-28, PageID.2418.) She further indicated that on days where the clinic was open to guests, students would be "required" to clean common areas whenever there was downtime and that "if you didn't have anything to do, that's what you did." (ECF No. 140-7, PageID.4868–4869.) Furthermore, Plaintiff

39

Zimmerman testified that she did not see cleaning as part of her curriculum but was asked to do cleaning activities by her instructors. (ECF No. 60-29, PageID.2492.) She complied because she is a "respectful person, so [she] did what was asked of [her]" (*id.*) and when she was asked to do cleaning by an instructor, it was her understanding that she was expected to do so. (ECF No. 140-8, PageID.4951.) As the Court previously recognized, the stark power imbalance between Defendants and Plaintiffs should also be considered in evaluating the implicitly mandatory nature of these tasks. (ECF No. 77, PageID.3573.) This cleaning work was a shared expectation among students: Plaintiff Eberline indicated that "we all were supposed to. . . partake in these [general cleaning] things[,]" although "teachers pets" would often be assigned less cleaning work. (ECF No. 140-6, PageID.4790.)

Additionally, Plaintiff Poxson was vaguely aware that there was additional staff hired to engage in the same cleaning services as done by Plaintiffs, but contrary to Defendants' assertion, she did not "admit[ that] she was not required to do laundry because others were hired to do it." (ECF No. 134, PageID.4576.) Instead, Plaintiff Poxson testified that she "[thought] there were people that helped" with cleaning and she knew

that there were "laundry attendants that would do laundry during the week," but that "we would go help[.]" (ECF No. 60-28, PageID.2404.) Plaintiff Eberline, however, did not know if Defendants employed janitors but expressed that she "[could not] imagine they did because otherwise why would we have to do all that stuff?" (ECF No. 60-27, PageID.2325.)

Defendants point to Scott Weaver's testimony that "[t]he instructor will give them options of what [the students] need to work on [during downtime]." (ECF No. 60-34, PageID.2572.) In his personal experience with students with whom he worked, if a student asked to do something else (e.g., working with guest services instead of cleaning), Weaver would agree and tell them to "[j]ust keep yourself busy." (*Id.*) But Weaver's testimony is limited to his personal experience working with students and does not address how often students asked him (let alone felt comfortable enough to ask, considering the inherent power dynamic between the owner of the school and its students) to do a different activity other than cleaning if they were instructed to do so.

Cleaning and janitorial tasks were particularly required for students who needed to do make up hours on Mondays during the day,

when the clinic was closed to customers. Plaintiff Poxson testified that when students came in for make-up hours on Mondays, "all you would do is clean. . . . [Y]ou weren't allowed to get your mannequins out or work on them at all, just cleaning." (ECF No. 60-28, PageID.2402.) Nor were they allowed to work on other students or do any non-cleaning work on Mondays. (*Id.*) It is true that the students were able to sign up to do whatever number of hours (with a maximum of seven) on Mondays that they wished. (*Id.* at PageID.2407.) Additionally, students came in on Mondays during the day to make up hours, only; there was no rotation of students for the purposes of experiencing deep cleaning or any other organized, school-wide system. (ECF No. 140-7, PageID.4870.)

The parties debate significantly over how the Court should interpret Weaver's testimony that "our requirement [is] if a student is refusing to participate in any activity, then they would be sent home for the day because we're required by law to keep a student busy." (ECF No. 140-12, PageID.5017.) When further asked about whether a student "could refuse to participate in laundry[,]" Weaver directly responded "[n]o." (*Id.*) Plaintiffs suggest this is an admission that these activities were thus mandatory. (ECF No. 140, PageID.4662.) Defendants contend

42

that Weaver's testimony had a broader meaning: "that if students refused to do anything during their downtime, then they would be sent home—they were required to be engaging in one of the options presented to them (which included working on their skills with other students or mannequins)." (ECF No. 142, PageID.6188.) Defendants further argue that "[t]his testimony cannot be used in favor of Plaintiffs' motion for summary judgment, as it must be construed in the light most favorable to Defendants in that context. *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018)." (*Id.*) The Court agrees with Defendants that their interpretation of Weaver's testimony is plausible and, therefore, must be construed in the light most favorable to Defendants for the purposes of this analysis.

In sum, the general cleaning tasks outlined by students were effectively mandatory. While cleaning did not comprise the entirety of their downtime, and Defendants gave instructors a series of options for activities to give to students, students were nevertheless directed to engage in cleaning activities by their instructors during clinic and it was expected students would do so. Defendants offer no evidence to the contrary—even viewing Weaver's testimony in the light most favorable

to Defendants. Furthermore, students who were required to do make-up hours were limited to general cleaning tasks if they came in on Mondays during the day. Accordingly, this factor leans in favor of finding Defendants as the primary beneficiaries of the cleaning work.

### e. The relationship of the work at issue to the school curriculum, state regulations, and the school's stated mission and educational philosophy.

The fifth factor for consideration is the relationship of the work at issue to the school curriculum, state regulations, and the school's stated mission and educational philosophy. All Plaintiffs testified that they did not receive any classroom-based or supervisor instruction on the janitorial tasks at issue. (ECF No. 140-6, PageID.4782–4783; ECF No. 140-7, PageID.4871–4872; ECF No. 140-8, PageID.4952–4953.) Students were not graded on cleaning the common areas, restocking, or laundry in the Douglas J program (ECF No. 140-6, PageID.4783) and it was not tested on the state exam. (ECF No. 140-7, PageID.4871.) Nor are these topics included in the materials provided to instructors that outline topics of instruction or the Milady's Standard Cosmetology textbook used by the program. (*See* ECF Nos. 140-20–140-33.)

The topic of sanitation and patron protection (including proper sanitizing methods for tools and implements) is addressed in the curriculum via four-and-a-half hours of allocated instruction time, two student activities, and testing. (*See id.*; ECF No. 60-27, PageID.2322– 2323; ECF No. 60-28, PageID.2397; ECF No. 60-29, PageID.2475; ECF No. 60-29, PageID.2490.) However, as stated previously, Defendants' reply implicitly recognizes that sanitation (as a part of the Douglas J curriculum and the state examination) is different in kind from the janitorial tasks at issue. (*See* ECF No. 142, PageID.6185) ("Just like Douglas J's curriculum, Michigan Administrative Code R 338.2173 requires that sanitation *and salon management* be taught to students. The tasks that Plaintiffs now challenge are a crucial part of the processes for running a salon and helping others to make it run smoothly.") (emphasis in original).

Instead, Defendants argue that the janitorial tasks relate to Douglas J's mission to provide a realistic, real-world salon experience and that they are encapsulated by the part of the Douglas J curriculum and Michigan regulations (i.e., Michigan Administrative Code R 338.2173) devoted to teaching of salon management. (ECF No. 142, PageID.6184–

45

6185.) Defendants quote Douglas J's catalog to frame their mission as teaching "professional business building skills that are necessary for a well-rounded education and preparation for entry-level careers in the salon/spa industry." (ECF No. 21-8, PageID.313; ECF No. 134, PageID.4570.) Defendants also note that the clinic floor was created to "emulate a true salon setting" (ECF No. 21-8, PageID.312.) To the extent Defendants claim these janitorial tasks are crucial as a component of the real-world salon-based educational mission of Douglas J, this argument can be supported in one of two ways: (1) a demonstration that these tasks are indeed a component of real-world salon work; or (2) a showing that Douglas J intended for janitorial tasks to be part of their real-world educational undertaking. As set forth below in the discussion of the factor analyzing the real-world commercial setting of salons, there is no genuine dispute that completion of mandatory janitorial tasks are not required in real salon settings.

Nor have Defendants demonstrated that Douglas J intended to incorporate janitorial tasks as part of their educational goal to emulate real salons. Regarding the salon management curriculum, Defendants point to lessons related to the requirements of managing and working in

a salon as contained in chapter workbook materials and examinations. (ECF No. 142, PageID.6185; *see* ECF No. 140-23, PageID.5251–5269.) These workbook lessons include references to "[b]eing prepared to perform whatever services are required[,]" being a "team player[,]" and being ready to "[p]erform services asked of you." (*Id.* at PageID.5251–5252.) Defendants have not identified—nor has the Court found independently—sections of these materials that include janitorial tasks as part of the services for which cosmetologists should be prepared to perform or that are included in the idea of being a team player. Indeed, under Defendants' logic, there is a plethora of activities that could be justified as possible in the real-world setting: if an owner of a salon could theoretically ask a cosmetologist to mow the lawn in front of the salon facility, that would be encapsulated by Defendants' broad argument. And, as Plaintiffs highlight, "Defendants did not have students undertake practical applications *in any other area of potential salon ownership*." (ECF No. 140, PageID.4668) (emphasis in original). Accordingly, there is no genuine dispute that this factor favors finding Defendants as the primary beneficiaries of the janitorial tasks.

### f. The type of work performed in the corresponding real-world commercial setting.

The sixth factor for consideration is the type of work performed in the corresponding real-world commercial setting. Because Defendants conflate the need to have janitorial tasks done in a salon with the requirement that cosmetologists complete these tasks, Plaintiffs are correct that this factor leans in favor of finding Defendants as the primary beneficiaries of the janitorial tasks.

Defendants contend that the janitorial tasks are required in real-world salons, and imply that it is particularly required to be done by cosmetologists. (ECF No. 134, PageID.4572–4573.) Plaintiff Eberline recognized that cleaning of the entire salon was a needed part of operating such a business. (ECF No. 60-27, PageID.2323, 2344.) Additionally, Plaintiff Poxson agreed that as a practicing cosmetologist she has a responsibility "to clean her own area[,]" particularly with regard to sanitation. (ECF No. 60-28, PageID.2397.)[7] However, none of

---

[7] Plaintiffs are correct (ECF No. 140, PageID.4667) that this statement from Plaintiff Poxson appears to relate to sanitation as connected to the State of Michigan Licensing Test component:

Q. And in fact all of those things appear on your State of Michigan Licensing Test?
A. Yes.
Q. Both practical and, what did you call it, knowledge or classroom?

this testimony supports the contention that cosmetologists are often required to perform these general janitorial tasks *themselves* in real-world salons. Indeed, Plaintiff Eberline indicated that, of the three salons she worked at after graduation, she did not have to do laundry or sweeping beyond her area; she did occasionally volunteer to do so, but it was not a part of her job description and if she did not do those tasks, they would be completed by others (e.g., a maintenance worker, cleaning crew, or the receptionist). (ECF No. 60-27, PageID.2325–2326, 2344.)

Moreover, Defendants point to Weaver's testimony to argue that "voluntary teamwork" regarding these janitorial tasks is expected from real-world salons. (ECF No. 142, PageID.6185, 6188; ECF No. 60-34, PageID.2571.) According to Defendants, Plaintiff Eberline's experience occasionally assisting in laundry and sweeping at salons is emblematic

---

A. Theory.

Q. Theory. Thank you.

    And the component of it that I'm going to ask some questions about is the sanitation and the cleanliness of your area. You knew that was an important part of your education?

A. Yes.

Q. And you knew that and you've seen as a practicing cosmetologist that there's a responsibility that you have to clean your area of the things that you cause to be around that need cleaning?

A. Yes.

(ECF No. 60-28, PageID.2397.)

of the "crucial part of the processes for running a salon and helping others to make it run smoothly[,]" as taught at Douglas J. (ECF No. 142, PageID.6185; ECF No. 60-27, PageID.2323, 2344.) Yet this argument glosses over the details of students' experience at Douglas J. As set forth above, at Douglas J, students' completion of these tasks was mandatory and not on a volunteer basis. Additionally, the evidence suggests that even if cosmetologists in real-world salons do occasionally assist with these general janitorial tasks, they do not do so as regularly and frequently as do the students at Douglas J. Accordingly, this factor suggests that Defendants were the primary beneficiaries of the janitorial tasks at issue.

### g. The academic credit received by the plaintiffs for the work.

The seventh factor for consideration is whether Plaintiffs received academic credit for the general cleaning tasks. Plaintiffs and Defendants interpret this variable in different ways. Defendants correctly argue that Plaintiffs received academic credit for the time spent doing general cleaning tasks and that this time was counted toward the total hours of practical experience as required for their curriculum and licensure under Mich. Comp. Laws § 339.1207. (ECF No. 134, PageID.4573–4575.)

Plaintiff Poxson admitted that the time spent doing cleaning, laundry, and shelf restocking—on Mondays and during downtime—was credited as time on the clinic floor. (ECF No. 60-28, PageID.2424.) Similarly, Plaintiff Eberline admitted that she received credit for doing those tasks and "if [she] was physically clocked in [she] was getting credit." (ECF No. 60-27, PageID.2325.) While, as the Sixth Circuit recognized, it is unclear whether Defendants were permitted to issue credit for this time under state regulation, *Eberline*, 982 F.3d at 1011 (citing Mich. Admin. Code R. 338.2161), Plaintiffs were indeed credited for this time.

Plaintiffs disagree entirely, arguing that "[c]ontrary to Defendants' arguments, there is no dispute in this case that students *did not receive academic credit* for the general cleaning, laundry and restocking tasks." (ECF No. 140, PageID.4672) (emphasis in original). Plaintiffs contend this in the context of arguing that the excessive amount of time spent on general cleaning deprived Plaintiffs of time in which they could have engaged in practical applications of cosmetology. (ECF No. 140, PageID.4671–4673.) Specifically, Plaintiffs point to their testimony and

Minimum Practical Application ("MPA") Sheets (hereinafter, "MPAs") [8] to argue that students filled in these MPAs themselves but were directed to falsify entries and record time spent on cleaning tasks under a different categorization (e.g., hair cutting, coloring), which would later be signed by the instructor. (ECF No. 140-6, PageID.4788; ECF No. 140-7, PageID.4850; ECF No. 140-8, PageID.4941, 4949; ECF No. 140-39.) Plaintiff Eberline testified that there was no category for cleaning or restocking or laundry on the MPAs, and thus, students were "instructed to magically make those numbers work" by putting hours in categories regardless of whether that reflected the actual amount of time spent doing work in that category. (ECF No. 140-6, PageID.4788.) The implicit logic of Plaintiffs' argument is that Plaintiffs' time working on janitorial tasks may have been credited, but not *because* they engaged in janitorial tasks as required under the MPAs; rather, the time was credited under the system devised by Defendants to distribute work hours under needed subcategories.

---

[8] MPAs are time-keeping forms in which students record individual hours and practical applications required for meeting state requirements to sit for the state cosmetology exam. (*See, e.g.,* ECF No. 134, PageID.4555.)

While *Eberline* does not offer an explicit description for understanding how to conceptualize this factor and whether Plaintiffs or Defendants are correct, the Sixth Circuit nevertheless did indicate that Plaintiffs "received academic credit for the time spent on the tasks" when determining that the janitorial work took place in the educational context. 982 F.3d at 1014. Furthermore, when discussing how the segmented primary-beneficiary test includes an evaluation of benefits from the segment of work stemming from its place in the educational relationship, the Sixth Circuit noted that "for example, the district court should consider the fact that the students here received academic credit for the challenged work[.]" *Id*. at 1017. Accordingly, Defendants' conceptualization of the academic credit factor is best supported by *Eberline*, and this factor leans in favor of finding Plaintiffs were the primary beneficiaries of the janitorial work. Additionally, the concerns discussed by Plaintiffs here are perhaps more properly addressed in other factors (e.g., the relationship of the work at issue to the school curriculum, state regulations, and the school's stated mission and educational philosophy).

### h. No reasonable jury could find that Plaintiffs were the primary beneficiaries of the janitorial work.

53

Having considered each factor and additional consideration outlined as part of the *Laurelbrook* analysis, there is no genuine dispute of fact regarding any of the factors at issue, making this a question of law for the Court. *Keller*, 781 F.3d at 806, 816. While Plaintiffs did not expect payment for completion of the janitorial tasks, and received academic credit for such work, Plaintiffs received little to no educational value in doing so. Janitorial tasks are not standard components of cosmetology work in real-world salons. Nor were the janitorial tasks a component of the educational regime for cosmetologists: they had no relationship to the school curriculum, state regulations, or the school's mission and philosophy. Plaintiffs' completion of janitorial tasks resulted in less work to be performed by Douglas J's paid janitorial staff, to the school's competitive benefit in the commercial marketplace. Accordingly, it is clear as a matter of law that Defendants are the primary beneficiary of the janitorial tasks.

### i. Whether the work at issue is for de minimis amounts of time or is practically speaking too difficult to record.

This conclusion does not end the inquiry. As directed by *Eberline*, "before concluding any portion of plaintiffs' work for Douglas J is

compensable, the district court should determine whether the work at issue is for de minimis amounts of time or is practically speaking too difficult to record." 982 F.3d at 1018–19. "When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded." *Aiken*, 190 F.3d at 758 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692 (1946)); *see also United States Dep't of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 780 (6th Cir. 1995). The Sixth Circuit has indicated that three factors are relevant for determining whether otherwise compensable time is de minimis: "1) the practical administrative difficulty of recording the additional time; 2) the size of the claim in the aggregate; and 3) whether 'the claimants performed the work on a regular basis.'" *See*, *e.g.*, *Brock v. City of Cincinnati*, 236 F.3d 793, 804 (6th Cir. 2001) (quoting *Lindow v. United States*, 738 F.2d 1057, 1062–63 (9th Cir. 1984)).

As a preliminary matter, Defendants contend that the Court should not consider the time students took to complete janitorial tasks in aggregate as a category, but rather, this should be broken down such that "each individual task for which compensation is being sought should be considered independently." (ECF No. 134, PageID.4580.) According to

55

Defendants, Plaintiffs' claim "inappropriately lumps several tasks into one" and Plaintiffs have failed to present evidence of the amount of time spent on any individual task. (*Id.*) In support, Defendants cite *Lindow*, 738 F.2d 1057, and *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 415 (5th Cir. 2011), both cases in which numerous activities were alleged to be entitled to compensation and in which the Courts of Appeal broke the myriad tasks into subcategories and considered other tasks individually.[9] (*Id.*)

Plaintiffs are correct that neither *Lindow* nor *Chambers* supports Defendants' argument that the janitorial tasks here *must* be further subdivided for the de minimus analysis. (ECF No. 140, PageID.4701–4702.) *Lindow* and *Chambers* both considered tasks separately in part

---

[9] While Plaintiffs are correct that both cases upon which Defendants primarily rest their contention are not from the Sixth Circuit (ECF No. 140, PageID.4701), the Sixth Circuit has nevertheless previously cited *Lindow* in its own analysis of de minimus activities. *See, e.g., Aiken*, 190 F.3d at 758; *Brock*, 236 F.3d at 804. Because *Eberline* was a case of first impression by indicating that students seeking compensation for unpaid labor could subdivide the tasks for which they sought compensation, the extent to which *Lindow* and *Chambers* are to be distinguishable as cases dealing with overtime claims is unsettled. Nevertheless, because the Sixth Circuit cited to another overtime case when outlining that the Court on remand must evaluate whether the time spent on janitorial tasks was de minimus, *see Eberline*, 982 F.3d at 1019 (citing *Aiken*, 190 F.3d at 758), the Court will look to *Lindow* and *Chambers* for guidance.

56

because some of the tasks for which the plaintiffs sought compensation were not compensable under the FLSA. For example, *Lindow* separated the task of reviewing a logbook from opening and closing the security gates, finding that the first task was pre-shift work and the second was specifically exempted under the Portal-to-Portal Act. *See* 738 F.2d at 1061–62, 1064. Similarly, *Chambers* grouped the approximately 17 tasks for which the plaintiffs sought compensation into analytical categories, ultimately rejecting certain categories as comprising those incidental to the employee's commute and thus non-compensable or categorizing them as having been done off-the-clock without employer's knowledge. *See*, *e.g.*, 428 F. App'x at 415–21. Defendants have not explained why grouping the individual tasks into a combined janitorial tasks category here would implicate any concerns about improperly lumping non-compensable with compensable tasks; nor has the Court independently found any precedent that would suggest otherwise. Plaintiffs are correct that "the challenged activities here do not require separate legal analysis for discrete tasks." (ECF No. 140, PageID.4702.)

Additionally, it is worth noting that the Sixth Circuit did not express any concern about the Court's grouping of the janitorial tasks as

a single category, and, indeed, it appeared to suggest that the collective amount of time proposed by Plaintiffs for these tasks was possibly not de minimus. *Eberline*, 982 F.3d at 1018 ("[S]ome of the plaintiffs may have spent more than 20 percent of their time at Douglas J on those tasks. That amount of time is unlikely to be de minimis, and it is appropriate that our test requires a separate analysis of it."). Accordingly, it is proper to evaluate whether the time in aggregate completing the category of janitorial tasks was de minimus.

Still, the question remains as to how the Court should evaluate the evidence to determine how long Plaintiffs spent completing the janitorial tasks in aggregate. There are two main sources of evidence on this question: (1) the MPAs; and (2) Plaintiffs' testimony.

Defendants note that "the only record evidence is the Plaintiffs' MPAs, which [Plaintiffs] completed at the time of their education[.]" (ECF No. 134, PageID.4581.) Defendants emphasize that students were responsible for tracking their own hours; instructional materials underscored the importance of filling out the MPAs accurately because the information would be reported to the state cosmetology board to demonstrate eligibility for the licensing exam; and Plaintiffs provided

services to hundreds of clients during their time at Douglas J and otherwise recorded their downtime hours on their MPAs. (*Id.* at PageID.4555–4556, 4559.) According to Defendants, "Plaintiffs MPAs show nominally more *sanitation* hours than the 40 hours required by the state" and that the MPAs "do not show that [Plaintiffs] spent 10%, much less 30%, of their time performing cleaning activities." (*Id.* at PageID.4559, 4581; ECF Nos. 5–7) (emphasis added).

In contrast, Plaintiffs highlight the testimonial evidence. Specifically, Plaintiffs note that students performed these tasks daily and, on Mondays and days they were assigned to be clinic attendants or in guest services, did so all day. (ECF No. 140, PageID.4663; ECF No. 140-6, PageID.4772–4773; ECF No. 140-7, PageID.4869; ECF No. 140-8, PageID.4947.) Plaintiffs proposed that they spent on average 18% of their 1,500 hours performing these janitorial tasks (in addition to time spent as part of the sanitizing and patron protection activities): Plaintiff Eberline spent a minimum of 23% of her time on these tasks, while Plaintiff Poxson spent 20% of her time and Plaintiff Zimmerman spent 10% of her time on them. (ECF No. 140, PageID.4663; *see also* ECF No. 60, PageID.2061–2063.) Plaintiffs explain the alleged contradiction with

59

their contemporaneous MPAs by indicating that instructors directed them to falsify MPA sheets and record time spent completing the janitorial tasks as time spent doing categories that were included on the MPAs. (*See* ECF No. 140, PageID.4671–4672; ECF No. 140-6, PageID.4788; ECF No. 140-7, PageID.4850; ECF No. 140-8, PageID.4941, 4949; ECF No. 140-39.)

In support, Plaintiffs direct the Court to certain of Plaintiff Poxson's MPA entries, which indicate that on Mondays she only performed various hair and nail services—despite the fact that there were no clients and no permitted mannequin times on Mondays. (*See* ECF No. 140, PageID.4672; ECF No. 140-6.) However, Defendants challenge this, noting that clinics are open to guests on Monday evenings and that Plaintiff Poxson clocked in at 4:30 p.m. on one of the days reflected in Plaintiffs' selected MPAs (i.e., 1/28/2013); while there is no timecard available for the latter day (i.e., 2/11/2013), there is nevertheless the possibility that she again was part of the evening shift. (ECF No. 142, PageID.6178–6179.)

In sum, Defendants argue that "the MPAs contradict Plaintiffs' guestimates of the time they spent on cleaning tasks." (ECF No. 134,

PageID.4560, 4574.) Defendants point to two district court decisions in support of their contention that self-serving testimony that contradicts contemporaneous records is insufficient to defeat summary judgment, even when Plaintiffs claim that there is a contradiction due to their superiors. *See Bill Call Ford, Inc. v. Ford Motor Co.*, 830 F. Supp. 1045, 1050 (N.D. Ohio 1993); *White v. Washington Gas*, 2005 WL 544733, at *2, *5 (D. Md. Mar. 4, 2005). (ECF No. 134, PageID.4574–4575.) In the alternative, Defendants argue that this "[a]t worst" "raises a question of Plaintiffs' credibility[,]" which would require resolution by a jury. (ECF No. 142, PageID.6179.)

However, Defendants' argument is not entirely in line with in-circuit precedent. The Sixth Circuit has previously found that deposition testimony from an employee regarding the number of hours worked was sufficient to create a genuine dispute of fact regarding whether an employee worked overtime without compensation even when this testimony was contradicted by contemporaneous time records. *See Moran v. AL Basit LLC*, 788 F.3d 201, 205 (6th Cir. 2015) ("Defendants emphasize the fact that Plaintiff's testimony is inconsistent with the allegedly contemporaneous timesheets Defendants provided to the court.

61

But these timesheets do not amount to objective incontrovertible evidence of Plaintiff's hours worked. Plaintiff denies the validity of these timesheets, which were handwritten by Defendants, and contends that Defendants sanctioned his overtime work. Whether his testimony is credible is a separate consideration that is inappropriate to resolve at the summary judgment stage.").

Defendants also urge the Court to find that Plaintiffs' testimony and Plaintiffs' calculations are "physically, and logically, impossible" (ECF No. 134, PageID.4577; *see also* ECF No. 142, PageID.6177), such that this evidence should be disregarded as farfetched at the summary judgment stage. *See Galey v. May Dep't Stores Co.*, 9 F. App'x 295, 298 (6th Cir. 2001) ("The summary judgment paradigm requires a court to draw and respect only reasonable inferences; a court need not regard that which is farfetched or fantastic."). Defendants point to Plaintiff Poxson's testimony that at times there would be 80 people on the clinic floor, and students would spend 2 to 3 hours on slow days cleaning; if Mondays through Wednesdays were typically slow, that would translate to a combined total of all students cleaning the clinic for 160 to 240 hours per week. (ECF No. 60-28, PageID.2418, 2421.) Similarly, Defendants

62

calculate that Plaintiffs' numbers result in more than 82 hours per day[10] of janitorial tasks completed by all students at a location, which is the equivalent of 10 full-time employees. (ECF No. 142, PageID.6177.) Yet Defendants' calculations again rely on assumptions without support—for example, assuming that *every* Monday and Wednesday of every week would involve in 2 to 3 hours of cleaning. The Court cannot find that Plaintiffs' testimony is farfetched in a vacuum without further evidence, such as the average length of time required to complete the janitorial tasks at issue.

As a result, there are a few considerations for the Court to balance. In the initial opinion granting summary judgment to Plaintiffs for these janitorial tasks, the Court found that "[t]here is no genuine issue of material fact as to the nature and extent of plaintiffs' cleaning, restocking, and laundry tasks because defendants offer no competing figures." (ECF No. 77, PageID.3574–3575.) The same is true now: Defendants do successfully counter Plaintiffs' alleged proof of the

---

[10] This is calculated by taking Plaintiffs' total number of hours claimed (154,440) and dividing it by the number of working days per year (312, because the clinics are open to students only 6 days per week) and further dividing it by six schools. (ECF No. 142, PageID.6177.)

falsified numbers in Plaintiff Poxson's selected MPAs, and assert that the overall numbers are far-fetched, but once again Defendants do not offer any other time figures for comparison. This is particularly significant because Defendants do not appear to contest that Plaintiffs did, indeed, do these janitorial tasks at least occasionally; they challenge the frequency at which these tasks were done. Defendants also impliedly argue that, even though there is no subcategory on the MPAs for these janitorial tasks, all of Plaintiffs' time completing the janitorial tasks must have been recorded in the sanitation subcategory. However, Defendants offer no proof of this, beyond the connection of sanitation activities with janitorial tasks as both being nominally cleaning-related.

Defendants' assertions that Plaintiffs' testimony contradicts the MPAs is thus not as iron-clad as they contend. If Defendants do not dispute that Plaintiffs did at least occasionally do these janitorial tasks while in clinic, and there is no place on the MPA for which to record those hours, the MPAs do not contradict Plaintiffs' testimony. This is a far cry from the classic one-for-one time recording situation in which a plaintiff's credibility is lacking for having contemporaneous records that are blatantly inconsistent with testimonial evidence. *See*, *e.g.*, *Robinson v.*

*Roberts Hotels Mgmt. Detroit, LLC*, 661 F. App'x 890, 891 (6th Cir. 2016)

("While [the plaintiff] testified that he worked ten-hour days on five or

more days per week, his testimony was weak. For example, he testified

that he worked Wednesdays through Sundays, . . . but his own notes

showed that he worked Tuesdays through Saturdays[.]"). Furthermore,

the FLSA cases cited by Defendants concern calculation of overtime

hours worked, in which "the employer [] has the duty under § 11(c) of the

[FLSA] to keep proper records of wages [and] hours[.]" *Moran*, 788 F.3d

at 205 (quoting *Anderson*, 328 U.S. at 687). The situation here is not a

debate over the total hours worked, but rather, *what was done during*

*those hours*; this is different in kind.

Because the MPAs do not contradict Plaintiffs' testimony, and

Defendants have offered no evidence to counter Plaintiffs' testimony

regarding the total time engaged in janitorial tasks, there is no genuine

dispute that Plaintiffs engaged in this work daily and spent on average

18% of their 1,500 hours performing these janitorial tasks. (ECF No. 140,

PageID.4663; *see also* ECF No. 60, PageID.2061–2063.) This is

significant more than "only a few seconds or minutes of work[.]" *Aiken*,

190 F.3d at 758. Nor is there any assertion that there is any administrative difficulty to be found in recording the additional time.

Accordingly, there is no genuine issue of material fact that Plaintiffs engaged in janitorial tasks for more than a de minimus amount of time. Plaintiffs' completion of janitorial tasks at Douglas J is compensable, and summary judgment in favor of Plaintiffs with regard to the janitorial tasks is proper.

### D. No reasonable jury could find that Defendants were the primary beneficiaries of the client services.

Consideration of the same primary-beneficiary analysis regarding client services leads to the contrary conclusion as that for janitorial tasks: Plaintiffs were the primary beneficiary of client services in the clinic setting. Because no reasonable jury could find otherwise, Defendants are entitled to summary judgment for this segment of work.

#### a. There are several factors which conclusively show Plaintiffs or Defendants as the primary beneficiaries of the client services work. Additionally, it is undisputed that these tasks were not de minimus.

Because some of the factors identified by *Eberline*, 982 F.3d at 1014, as applied to this category are without serious debate, the Court need not undergo the same factor-by-factor analysis as with janitorial tasks.

Again, as with the janitorial tasks, there is no genuine dispute of fact that Plaintiffs did not expect monetary compensation; this factor leans in favor of concluding that Plaintiffs are the primary beneficiaries. (ECF No. 134, PageID.4557; ECF No. 140, PageID.4699.) Similarly, these client services are the same as those performed in the corresponding real-world setting and students received academic credit for this work; both factors also suggest Plaintiffs are the primary beneficiaries. Furthermore, although Plaintiffs dispute the quality of education regarding client services (as set forth below), there is no doubt that the performance of guest services are clearly central to the Douglas J curriculum, state regulations, and Douglas J's stated mission and educational philosophy. This again suggests Plaintiffs are the primary beneficiaries.

However, there is also no dispute that these tasks were mandatory, which suggests Defendants are the primary beneficiaries. Additionally, there is no genuine dispute that completion of these client services tasks

was not de minimus: this undoubtedly constituted the majority of students' time in the clinic setting. (ECF No. 140, PageID.4702.)

Accordingly, there are only two factors that will require closer scrutiny with regard to the client services work: (1) the educational value, both tangible and intangible, of the client services tasks; and (2) the displacement of paid employees to Douglas J's competitive benefit in the commercial marketplace.

### b. The educational value, both tangible and intangible, of the tasks under scrutiny.

Plaintiffs contend that Defendants' practices "undermine the educational value of students providing services to guests" such that Defendants "recouped the primary benefit of such work through cost savings and increased profits." (ECF No. 140, PageID.4675.) First, Plaintiffs note numerous issues with instructors. Plaintiffs point to Defendants' failure to comply with generally equivalent laws in Michigan, Illinois, and Tennessee requiring at least one licensed instructor per every 20 to 25 students (depending on the particular state law at issue); instead, at Douglas J there was often a 30 students-to-instructor ratio, if there was an instructor on the clinic floor at all. (*Id.* at

68

PageID.4676; ECF No. 71, PageID.2918; ECF No. 140-6, PageID.4759; ECF No. 140-7, PageID.4866; ECF No. 140-8, PageID.4931.) Additionally, Plaintiffs argue that instructors spent minimal time supervising students (generally only at the time the customer arrived and when services were completed); the quality of the instruction was poor (e.g., instructors would complete a service themselves without explanation if one of the Plaintiffs had difficulty doing so); and instructors were often unlicensed with little to no experience. (ECF No. 140, PageID.4677–4679.) Defendants dispute this, highlighting Defendant Weaver's testimony that Douglas J meets the mandated ratio and often targets for lower student-to-instructor ratios and that licensed instructors were always present even when student instructors were working as well. (ECF No. 142, PageID.6179; ECF No. 60-34, PageID.2562, 2589.)

Plaintiffs also argue that the educational value of the services performed was deficient because Defendants assigned students to perform particular services for clients based on already-acquired skills rather than a student's educational needs. (ECF No. 140, PageID.4679.) For example, Plaintiff Zimmerman had previous experience before

enrollment in Douglas J with providing massages; she would often have been assigned a haircut service at the beginning of her shift but would later have her assignment changed to perform a spa service. (*Id*.; ECF No. 140-8, PageID.4950.) Customers regularly made requests for particular students to perform services and "these requests were uniformly granted[,]" resulting in repetition of students' previously-mastered techniques. (ECF No. 140, PageID.4680.) These practices, as well as the falsified MPAs, resulted in students receiving credit for performing certain services on their MPA sheets without having ever performed such core services on clients. (*Id*.) Nevertheless, it is worth noting that Plaintiffs' cited testimony in this regard suggests that Plaintiffs may not have performed certain services on guests, but that they did practice doing so on mannequins (e.g., Plaintiff Eberline never did a perm on a guest but did so on a mannequin; Plaintiff Poxson did finger waves and relaxer treatment on a mannequin, but did not do so for the 20 hours on live clients as recorded on her MPAs; Plaintiff Zimmerman did not do perms, hair breading, pressing, or hair weaving on live clients). (*See* ECF No. 1406-6, PageID.4783; ECF No. 140-7, PageID.4865; ECF No. 140-8, PageID.4948.) Yet again, Defendants

70

dispute this, highlighting testimony from Defendant Scott Weaver that students were not assigned on these bases and that assignments were done based on instructors partnering with guest services team to provide students an array of guests and/or student requests. (*See* ECF No. 142, PageID.6179; ECF No. 60-34, PageID.2585.)

Defendants offer evidence in support of the contention that regardless of these alleged deficiencies in the educational environment of the clinic, Plaintiffs still received educational value from their clinic services. Defendants highlight Plaintiffs' agreement that the clinic was designed to concentrate on the improvement of skills and reinforcing of previously-acquired knowledge, as well as to prepare students to work in or own a salon by emulating a salon setting. (*See* ECF No. 60-28, PageID.2398; ECF No. 60-27, PageID.2323; ECF No. 60-29, PageID.2488.) Plaintiff Poxson testified that she received grades and related explanations of those grades from instructors every time she provided a service to a client. (ECF No. 60-29, PageID.2488.) Furthermore, she agreed that she was better skilled and more efficient once she finished clinic as compared to her first time on the clinic floor; she obtained the type of progress that she had hoped to obtain through

71

that experience; and the skills learned in terms of performing services for clients that were ultimately on her state licensing test. (*Id.* at PageID.2397, 2488.) Plaintiff Zimmerman indicated that she believes she accomplished improvement in "some" but "not every technical skill" through her time in clinic. (ECF No. 60-29, PageID.2496–2497.) Additionally, Plaintiff Eberline indicated that her time working in the clinic taught her "somewhat more" about techniques and efficiency, although those improvements were not the same for all services. (ECF No. 60-27, PageID.2314.) And, as Defendants note, Plaintiffs Poxson and Zimmerman admit that their time in the clinic prepared them to pass the licensing examination itself in addition to providing academic credit for the prerequisite 1,500 hours required to take the licensing exam; Plaintiff Zimmerman, however, did qualify that she "expected a lot more [from her education at Douglas J] from what I received." (ECF No. 60-28, PageID.2386; ECF No. 60-29, PageID.2473.) All three Plaintiffs passed the licensing exam on the first attempt. (ECF No. 60-29, PageID.2473

Plaintiffs may have expected (perhaps reasonably) a better educational value for their time in the Douglas J program, and it very well may be that Douglas J's practices are in certain instances contrary

to state law regarding proper instructor ratios, resulting in uneven improvement across all cosmetology skills in the array of services possible and overemphasizing of facets of the clinic education that result in a profit for Douglas J. Yet Plaintiffs admit that they improved their cosmetology techniques in at least some areas as a result of their time in the clinic and this experience eventually equipped them to pass the licensing exam on the first try. Any regulatory deficiencies and overemphasis on certain activities that resulted in high revenue nevertheless provided Plaintiffs tangible benefits in terms of improved skills and licensing. Accordingly, this factor favors finding Plaintiffs as the primary beneficiaries of the janitorial tasks.

### c. The displacement of paid employees to the school's competitive benefit in the commercial marketplace.

Evaluation of this factor is tricky because, unlike some precedent, there is no comparator employee whom the students previously replaced or who can theoretically replace the students. *See, e.g., Laurelbrook*, 642 F.3d at 527 (evaluating the analysis regarding employee status of students in *Baptist Hosp., Inc.*, 473 F. Supp. at 473 to note that the students displaced employees because "the hospital would have had to hire more employees or require its regular employees to work overtime"

without the students' work and students who staffed the chest X-ray rooms of the hospital were assigned to shifts originally held by employees). The Douglas J entity at issue here is in its entirety a cosmetology school: it is undisputed that only students perform client services at the student clinic, even though licensed instructors are present. (ECF No. 134, PageID.4569.)

Plaintiffs do not discuss the displacing of workers directly and focus instead on the fact that student labor results in a large competitive benefit to Douglas J in the commercial marketplace: the schools capture a different sector of the market (i.e., customers seeking mid-range and lower cost salons) than Defendants' upscale salons, while relying on uncompensated student labor to reduce operating costs. (ECF No. 140, PageID.4682–4683.) And this model achieves financial results: revenues from client services at Douglas J's schools are comparable to the similar activities' revenues from Defendants' salons. (*Id*.) Plaintiffs propose that these similar revenue streams also suggest that students' performance of these services "do not hinder the employer's operations[,]" impliedly contrasting to *Laurelbrook*, 642 F.3d at 531, where it was noted that

instructors would have been able to complete more productive tasks were it not for their supervisory responsibilities. (ECF No. 140, PageID.4683.)

Comparison to *Laurelbrook* is illuminating. 642 F.3d at 520, 531. There, students at the Laurelbrook boarding school worked in the Sanitarium run by the school as part of its vocational training program, in addition to performing other work roles outside the Sanitarium (e.g., selling flowers and produce). *Id*. The Sixth Circuit noted the district court's finding that Laurelbrook was staffed sufficiently such that staff members could provide the same services at the Sanitarium and the same work performed by students outside the Sanitarium even without the students' labor, offsetting the benefits of having student labor at Laurelbrook. *Id*. However, the district court also noted the purpose of the Sanitarium as an educational endeavor to Laurelbrook was crucial to the determination that workers were not displaced by the students' labor:

> The Sanitarium is staffed such that if the students were not training there, staff members could continue to provide the same patient services. *But since the Sanitarium is integral to the education the school provides, Laurelbrook would not operate the Sanitarium if the school did not exist.* In other words, the Sanitarium's sole purpose is to serve as a training vehicle for students. Therefore, the district court reasoned, students do not

displace adult workers or other employees who might be willing to work at the Sanitarium.

*Id*. (emphasis added). Here, Defendants would not operate the clinic if Douglas J were not a school. It could be argued that students at Douglas J do not displace workers who might be willing to work in the clinic-style environment because the clinic's status as a part of the Douglas J school is crucial to its existence. This can be contrasted to situations like in *Baptist Hosp., Inc.*, 473 F. Supp. at 473, where the hospital in the case existed independently of its status as a place where students worked.

However, there are crucial differences between Laurelbrook and Douglas J: Laurelbrook, of which the Sanitarium is a part, was a non-profit corporation, and Laurelbrook's status as a religious institution was a key component of both the district court's and the Sixth Circuit's evaluation of the benefits accrued to Laurelbrook. *Laurelbrook*, 642 F.3d at 520–21 ("Any benefits Laurelbrook derives from its students are 'secondary to its religious mission' of providing academic and practical training."). The Sixth Circuit also noted that "Laurelbrook is not in competition with other institutions for labor, so Laurelbrook does not enjoy an unfair advantage over other institutions by reason of work performed by its students." *Id*. at 531. In contrast, Douglas J is in

76

competition with other cosmetology schools in addition to salons. Furthermore, while Defendants analogize to *Laurelbrook* in noting that that "nearly all of the revenue" from the Douglas J clinic services was "recycled" into the schools' operations, Defendants mistake the conclusion drawn from this analogy: *Laurelbrook* determined that this recycling of revenues from services "contribute[d] to Laurelbrook's maintenance, thereby benefitting Laurelbrook's operations." 642 F.3d at 530. (ECF No. 142, PageID.6181.)

Therein lies the rub. Equating Laurelbrook with Douglas J would require the Court to ignore Douglas J's status as a for-profit school in competition with other institutions for labor, and to disregard the Sixth Circuit's emphasis on Laurelbrook's religious mission. While Plaintiffs emphasize Douglas J's successful revenue streams, the Court's conclusion would be the same regardless of Douglas J's relative financial success: operation of the school allows Defendants to avoid paying employees for client services by use of unpaid student labor, to their benefit. Accordingly, this factor leans in favor of finding Defendants as the primary beneficiaries of the client services.

### d. No reasonable jury could find that Defendants were the primary beneficiaries of the client services.

Accordingly, there is no genuine dispute of fact that Plaintiffs were the primary beneficiaries of the client services work. Although there is clear financial benefit to Douglas J from the students' client services work, evaluation of the factors confirms that the primary benefit is to the students, whose clinic services work provided them with academic credit, emulated the real-world salon environment, and led to learning tangible skills that successfully translated into cosmetology licensing. To find otherwise would require Douglas J to compensate students for educational work: exactly the situation contemplated by the Sixth Circuit. *See Eberline*, 982 F.3d at 1016 ("The primary-beneficiary test allows courts to separate claims brought by students who are merely doing the work their curriculum requires from those doing work that does not provide a similar curriculum-based benefit to the students.").

### E. Summary judgment for Defendants is not appropriate regarding the retail sales tasks, because a factfinder could reasonably find that Plaintiffs were employees when completing those tasks and there is a genuine dispute of fact as to whether the time spent was de minimus.

As set forth previously, the Sixth Circuit has acknowledged that FLSA employment status is traditionally a question of law, there are particular "close cases" in which courts must "eschew summary judgment when presented with genuine disputes of fact." *Werner*, 529 F. App'x at 543. Consideration of the *Laurelbrook* analysis as outlined in *Eberline* reveals that Plaintiffs' claim for FLSA compensation for retail sales is such a close case, precluding summary judgment.

### a. Plaintiffs' lack of expectation of payment

As with the other segments of tasks, there is no dispute that Plaintiffs did not expect monetary compensation for retail sales; there is no genuine dispute of fact that this factor leans in favor of concluding that Plaintiffs are the primary beneficiary of this segment of work.

### b. The educational value, both tangible and intangible, of the tasks under scrutiny.

Regarding retail sales, Plaintiffs contend that there was little to no educational value through reference to the students' depositions. Plaintiff Eberline testified that sales skills were a part of the curriculum at Douglas J (specifically, interactions with clients and suggestions of possible products to purchase) but that she believed it was "common

79

sense." (ECF No. 140-6, PageID.4764.) Plaintiff Zimmerman felt that she received "[n]o educational value" from sales tasks. (ECF No. 140-8, PageID.4946.) She testified that a cosmetologist's sales ability is a much lower value skill than haircutting and hair coloring skills. (ECF No. 140-8, PageID.4956.) Furthermore, Plaintiff Zimmerman testified that the retail sales were not part of her education but "w[ere] actually incentive for us to sell to the client[,]" as evidenced by the school's tracking of product sales for purposes of giving an incentive in the form of a free service. (ECF No. 140-8, PageID.4919, 4921.) Plaintiff Zimmerman testified that she believed retail sales "was one of those things you can kind of pick up on your own[,]" and that retail sales were a "no-brainer" that did not require going to cosmetology school but could be "learn[ed] on the job." (ECF No. 140-8, PageID.4936.)

Additionally, it is worth noting that Defendants' argument (ECF No. 149, PageID.6219–6220) that Plaintiff Zimmerman's statement that retail sales had "[n]o educational value" was self-serving and conclusory—and therefore does not create a genuine dispute—ignores the context of Plaintiff Zimmerman's overall deposition testimony. Elsewhere, Plaintiff Zimmerman explains that she believed that the

skills required to do retail sales were those that could be learned on the job. While her statement may perhaps be self-serving, this in itself is not a bar to creating a genuine issue of material fact. *See Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) ("Although perhaps not as strong as some other evidence might be, self-serving statements can create a genuine dispute of material fact to be resolved at trial.").

Even assuming that Plaintiff Zimmerman's statements taken in the context of her overall deposition testimony were conclusory, Defendants' reference to case law does not change this analysis. Defendants are correct that "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009). But Defendants' reference to *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020), is unhelpful: *Viet* considered the level of specificity required for a FLSA plaintiff to demonstrate a jury question that she worked in excess of 40 hours a week, finding that bare assertions of an estimated amount of overtime do not create a genuine dispute of material fact under Federal Rule of Civil Procedure 56 while testimony or other evidence detailing the specific hours typically worked by an employee were sufficient (e.g.,

detailing how completion of the tasks required for this role amounted to a certain required number of hours per typical week). *Viet* thus considered the question of a quantitative FLSA issue—number of overtime hours worked—whereas the issue here is of a qualitative nature (i.e., the intangible educational value of a task as experienced by a student) for which there is no clear analog of a similar level of specificity required to explain why retail sales in the clinic had no educational value.

Similarly, Defendants reference *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020), for the contention that "blatantly false, self-serving testimony" does not create a genuine dispute of fact. But *Davis* explained that self-serving statements "might not be sufficient to survive summary judgment" in the instances where it is "blatantly and demonstrably false"—such as where testimonial evidence is contradicted by vide evidence or where testimonial evidence purports to describe a version of events that is totally implausible. *Davis*, 951 F.3d at 750. That there is a difference of opinion between Plaintiff Zimmerman and another student on the educational value of retail sales tasks does not make Plaintiff Zimmerman's opinion demonstrably false, nor is the assertion that retail

sales tasks involve implementation of skills that do not require training in the cosmetology setting an implausible contention.

However, Plaintiff Poxson's testimony suggests that there is a genuine dispute as to whether there was educational value from retail tasks. Plaintiff Poxson testified that she believed she "got better" at selling products as a result of her experience at Douglas J. (ECF No. 140-7, PageID.4849.) She testified that she "knew the [Aveda] products really well[,]" and that her knowledge of and familiarity with the products translated to better sales. (*Id.* at PageID.4848–4849.) Additionally, she "was more comfortable talking to people and taking them out, showing them the products, working with the products in their hair." (*Id.* at PageID.4849.) She believed her sales persona transformed for the better during her educational experience. (*Id.*) Accordingly, the Court finds there is a genuine dispute with regard to this factor.

The Court notes that as with client services, Plaintiffs again implicitly argue that the disproportionate focus on retail sales in the clinic setting—including a significant amount of effort spent tracking the dollar value of student sales and creating promotions and incentives to encourage student sales—took away focus from the core cosmetology

skills and techniques training. (ECF No. 140, PageID.4681.) Additionally, Plaintiffs effectively claim that the disproportionate emphasis on retail sales work was not for the purpose of providing students education on the topic but, rather, because of the revenue that student sales generated. (*Id*. at PageID.4682.) However, as set forth above, there was no genuine dispute of fact that Plaintiffs nevertheless received educational value from the client services work in question. Whether students received tangible or intangible benefits from retail sales, despite Douglas J's alleged overemphasis on retail sales for purposes of revenue instead of educational growth, remains at issue.

### c. The displacement of paid employees to the school's competitive benefit in the commercial marketplace.

The analysis for this factor mimics that for client services. Again, Douglas J would require paid employees to make sales of retail products were the students not engaged in this labor. The same distinctions between Laurelbrook and Douglas J matter the same to analysis of students' retail sales work as of client services. Accordingly, this factor leans in favor of finding Defendants as the primary-beneficiaries of the retail sales tasks.

### d. The mandatory or voluntary nature of the tasks.

Neither party addresses the mandatory or voluntary nature of retail sales in their briefing, but Plaintiff Zimmerman indicated that as a student, "you had to" attempt a retail sale for every client you served in the clinic, whether they received hair services or spa services. (ECF No. 140-8, PageID.4947.) It was part of the scoring mechanism used by instructors on reviews of a student's performance of individual guest services. (ECF No. 140-8, PageID.4918.) Accordingly, there is no genuine dispute of fact that this factor leans in favor of finding Defendants as the primary beneficiaries.

### e. The relationship of the work at issue to the school curriculum, state regulations, and the school's stated mission and educational philosophy.

Plaintiffs emphasize that retail sales of salon products are not a subject included in any state's mandated curriculum and are not tested on state licensing exams. (ECF Nos. 140-20–140-33, 140-39.) Plaintiff Poxson agreed that sale of cosmetology products was not a component of the state examination. (ECF No. 140-7, PageID.4849.) Defendants do not explicitly dispute this. However, the parties dispute the role that retail sales take in Douglas J's stated mission and educational philosophy.

Plaintiffs argue that retail sales are not substantively covered within Defendants' educational materials as a skill, but rather that students' retail sales tasks were only tracked in terms of sales revenue. (ECF Nos. 140-20–140-33, 140-39.) Plaintiffs point to the fact that Defendants tracked the dollar value of students' services per customer and retail sales on unit progress reports (ECF No. 147, PageID.6208; ECF No. 140-45; ECF No. 140-12, PageID.5030–5031), in contrast to the lack of any such tracking for proficiency with cosmetology skills. Plaintiffs thus impliedly argue that retail sales were not part of the school's educational mission and curriculum but were best understood as a means of sales revenue.

In contrast, Defendants again argue that the purpose of the Douglas J school is to emulate a salon setting, such that the emphasis on retail sales was in line with that overall mission. (ECF No. 149, PageID.6220.) They also point to brief references to retail sales on unit syllabi (ECF No. 140-21, PageID.5124, 5127, 5129), a few pages of theory workbook answers discussing retail sales (ECF No. 140-23, PageID.5255–5257), and one question on one of the unit's final exams (ECF No. 140-25, PageID.5431) to support their contention that retail

sales were covered as part of the curriculum. (ECF No. 149, PageID.6220–6221.)

The testimonial evidence suggests that sales skills were in some way part of the curriculum at Douglas J, but that the emphasis was indeed on number of sales made as compared to educational aspects of retail sales work (e.g., how to improve). Plaintiff Eberline testified that sales skills were a part of the curriculum at Douglas J (specifically, interactions with clients and suggestions of possible products to purchase) but that she believed it was "common sense." (ECF No. 140-6, PageID.4764.) She confirmed that students were evaluated and graded on their ability to encourage guests to buy products. (ECF No. 140-6, PageID.4768, PageID.4774.) Plaintiff Eberline testified that she believed, based on the instructors' behavior at morning group meetings with the students, that there was a competition for the instructors behind the scenes as to which instructor's group best performed in terms of retail sales. (ECF No. 140-6, PageID.4789.)

Plaintiff Poxson agreed that product sales were discussed in morning meetings and that specific products would be discussed in the classroom. (ECF No. 140-7, PageID.4873.) Plaintiff Poxson indicated that

there were incentives given to students who sold products at high rates, including pizza and ice cream parties; students who did not hit their sales numbers or who did not sell certain products would be called out at morning meetings or not allowed to participate in the reward. (ECF No. 140-7, PageID.4873.)

Finally, Plaintiff Zimmerman agreed that the textbook used by the Douglas J program talked about the importance of learning retail sales because it enhances the ability of the cosmetologist or salon to make money, but she indicated that this was only covered briefly ("a quick highlight that we did maybe . . . one time when we were doing interviews") in the curriculum. (ECF No. 140-8, PageID.4925.) Otherwise, according to Plaintiff Zimmerman, she "had no idea that [the school was] keeping track" of their sales until she received a report card that indicated sales progress (although she was not aware "if they gave a grade per se"). (ECF No. 140-8, PageID.4929, 4946.) Plaintiff Zimmerman further indicated that the amount of sales were tracked but the time spent engaging in retail sales was not tracked. (ECF No. 140-8, PageID.4946.)

In evaluating this collection of evidence, it is important to distinguish between the primary-beneficiary test's "educational value" factor and the "relationship of the work at issue to the school curriculum, state regulations, and the school's stated mission and educational philosophy" factor. In so doing, the Court must separate the idea of whether students received any educational benefit from the tasks (as evaluated in the educational value factor) from whether the educational program was intended to offer an educational benefit to the students (as evaluated under this factor). One could imagine a scenario where a student may learn from completing a task but not necessarily because this task was part of a holistic curriculum theory.

Defendants' view would have the Court consider this factor as an essential view of curriculum: the presence of any discussion of retail sales in the underlying curriculum materials—no matter how de minimus the inclusion is—in addition to the fact that these retail sales were done in the allegedly real-world-adjacent clinical setting, would be enough to conclude that Plaintiffs were the primary beneficiaries under this factor. The Court declines to follow Defendants' interpretation, which does not engage with the question of whether the school intended to have an

educational benefit to the students from these activities (i.e., their mission). Adopting Defendants' approach would allow schools to contend that uncompensated labor was a part of their educational mission based on only a passing reference to such labor in their curriculum, without further investigation of a school's intent.

Here, besides approximately two pages of fill-in-the-blank worksheets, there is no evidence that the students were ever instructed on how to improve their retail sales techniques—a brief handout is a far cry from instruction. Plaintiff Eberline testified that students would receive points based on whether or not they talked to a customer about purchasing products, and there is further testimonial evidence indicating that the actual amount of sales made per student were tracked. Yet there is no evidence that students were ever given feedback in any regard on their individual sales techniques nor offered any instruction in the classroom or clinical setting.

Once again, comparison to the circumstances in *Laurelbrook* is instructive. In *Laurelbrook*, the students took vocational courses that corresponded to their practical training (e.g., students worked in the Sanitarium kitchen and took a food service class as part of their training)

or received certifications in advance of completing work in an experiential setting (e.g., obtained Certified Nursing Assistant ["CNA"] training before being allowed to work in the Sanitarium to provide CNA services to patients). *See Solis v. Laurelbrook Sanitarium & Sch., Inc.*, No. 1:07-CV-30, 2009 WL 2146230, at *2–3 (E.D. Tenn. July 15, 2009). As a result, experiential learning settings were tied to an instructional component and comported with the educational mission of teaching skills that would allow the students to serve as missionaries in a Seventh-day Adventists religious denomination that valued practical training as part of an education. *Id*. Here, there was no such substantial educational instruction component alongside the experiential learning.

In sum, while there is a genuine dispute of fact as to whether students received an educational benefit from retail sales in the clinic setting, there is no dispute that retail sales were absent from state-mandated curriculum or the licensing examination. Furthermore, although retail sales are nominally present in the Douglas J curriculum materials, evaluation of the depth of instructional coverage suggests that retail sales were not connected to the school's mission or educational

philosophy. Accordingly, this factor leans in favor of finding Defendants as the primary beneficiaries of retail sales work of students.

### f. The type of work performed in the corresponding real-world commercial setting.

It is undisputed that some cosmetologists in some salons engage in retail sales like that conducted in the Douglas J school. However, there is a genuine dispute of fact as to whether the extent to which retail sales are performed in the real-world commercial setting mimics that completed at Douglas J.

Plaintiffs note that between the years 2012 through 2014, Defendants did not offer commissions for product sales to cosmetologists in their professional salons.[11] (ECF No. 147, PageID.6209; ECF No. 140-12, PageID.5025.) Plaintiffs allege that this "demonstrates the lack of value of these 'skills' in the real world." (ECF No. 147, PageID.6209.)

However, Plaintiffs' testimonial evidence indicates that other salons engage in retail sales and that sales skills are valuable to

---

[11] Defendants point to evidence that cosmetologists in Douglas J salons currently receive commissions for product sales (ECF No. 149, PageID.6221), but this is a distinct time period from that issue: This could possibly reflect a change in industry practice over time and does not inform the Court's inquiry here.

92

particular salons. Plaintiff Poxson indicated that she engaged in retail sales at two salons (e.g., Sam's, Smart Style) after graduating from Douglas J (and received a commission for doing so), but that sales were not a regular occurrence. (ECF No. 140-7, PageID.4831, 4832.) Plaintiff Zimmerman testified that at a salon she worked at following her graduation from Douglas J, whether she had to sell products "was not addressed" and she never sold a product when she was there. (ECF No. 140-8, PageID.4925.) However, Plaintiff Zimmerman agreed that salons value graduates from cosmetology schools who have the ability to sell product. (ECF No. 140-8, PageID.4953–4954.) Yet, in her own experience, she was not asked about sales techniques when applying for stylist jobs, and, once hired, she was not coached on sales or encouraged to make more sales. (ECF No. 140-8, PageID.4956.)

Because there is conflicting evidence about whether proficiency in retail sales is a valued skill to work as a cosmetologist in real-world salons, the Court finds that there is a genuine dispute of fact regarding the degree to which the retail sales are expected or emphasized in the real-world commercial setting.

### g. The academic credit received by the plaintiffs for the work.

Plaintiffs allege that students did not receive academic credit for these retail sales, in the sense that they were not tracked on student MPA sheets (i.e., the timekeeping tables used for generating credit based on hours performed of certain listed tasks). (ECF Nos. 140-20–140-33, 140-39.) However, Defendants point out—as they did for the janitorial tasks—that Plaintiffs received credit for all hours worked on their MPAs. (ECF No. 149, PageID.6221.)

While *Eberline* does not offer an explicit description for understanding how to conceptualize this factor and whether Plaintiffs or Defendants are correct, the Sixth Circuit nevertheless did indicate that Plaintiffs "received academic credit for the time spent on the tasks" when determining that the janitorial work took place in the educational context. 982 F.3d at 1014. Furthermore, when discussing how the segmented primary-beneficiary test includes an evaluation of benefits from the segment of work stemming from its place in the educational relationship, the Sixth Circuit noted that "for example, the district court should consider the fact that the students here received academic credit for the challenged work[.]" *Id.* at 1017. Accordingly, Defendants'

94

conceptualization of the academic credit factor is best supported by *Eberline*, and this factor leans in favor of finding Plaintiffs were the primary beneficiaries of the retail sales.

### h. Summary judgment for Defendants is not appropriate regarding the retail sales tasks, because a factfinder could reasonably find that Plaintiffs were employees when completing those tasks.

Ultimately, the evidence "presents a sufficient disagreement to require submission to a jury" as to whether Plaintiffs were employees when engaging in retail sales at Douglas J. *Keller*, 781 F.3d at 806. On one hand, Plaintiffs' required retail sales resulted in a competitive advantage to Douglas J; retail sales did not substantially relate to Douglas J's curriculum, mission, or educational philosophy, nor to state regulations. However, there is a genuine dispute as to whether Plaintiffs received educational value from retail sales and whether this was the type of work performed in real-world salons. As a result, the Court cannot determine whether retail sales constituted "labor that—although related to the educational relationship in an attenuated way—does not actually provide a benefit to students that exceeds the benefit of free labor received by the school." *Eberline*, 982 F.3d at 1017. Accordingly, summary judgment on these grounds is inappropriate.

95

### i. Whether the work at issue is for de minimis amounts of time or is practically speaking too difficult to record.

Finally, as directed by *Eberline*, "before concluding any portion of plaintiffs' work for Douglas J is compensable, the district court should determine whether the work at issue is for de minimis amounts of time or is practically speaking too difficult to record." 982 F.3d at 1018–19.

In Defendants' supplemental briefing, they argue that the time spent doing retail sales was de minimus. (ECF No. 149, PageID.6223.) In support, Defendants note that Plaintiffs have not cited any evidence as to how much total time was spent on retail sales. Nor does there appear to be separate reference explicitly in the record to the amount of time a student spent on each individual retail sale on average, or the exact total amount of time students spent doing retail sales over a broader time period (e.g., per week, over the course of their time at Douglas J). Plaintiff Zimmerman indicated that she would put her time engaged in retail sales under other categories on the MPA sheet, as instructed by her instructors. (ECF No. 140-8, PageID.4949.) Accordingly, there is no direct evidence of the amount of time spent on these tasks.

Defendants argue that the amount of time spent must have been no more than a few minutes per day, based on the testimony offered of what retail sales included: bringing the guest to the product area and showing them the available products, or gathering products used during the service provided and bringing available versions for sale directly to the guest after the completion of their service. Defendants suggest that, like the canine officers who attempted to recover for time spent caring for their police dogs in *Aiken*, Plaintiffs' depictions here are too generalized and constituted only a mere scintilla of evidence that was insufficient to create a question of fact. *See* 190 F.3d at 758 (citing *Anderson*, 477 U.S. at 248) ("Although plaintiffs' affidavits also indicate that officers must 'constantly' and 'on a regular basis' discipline their dogs, such generalities do not create a question of fact.").

However, testimony indicates that students were expected to, and did, attempt a retail sale with every customer: Plaintiff Poxson indicated that she would always either bring the client to the front desk to show them the product area before the client checked out or would bring a basket directly to the client at the seat with all products used as part of the services performed on the client before checkout. (ECF No. 140-7,

PageID.4857.) Plaintiff Zimmerman also testified that she would discuss a retail sale with every single guest who she worked on in the clinic setting. (ECF No. 140-8, PageID.4919.) This can be contrasted to *Aiken*, where the tasks at issues involved sporadic and randomly-timed activities (e.g., stopping to feed the dog, cleaning up after the dog while traveling to work, occasional discipline of the dog). 190 F.3d at 757–58.

Additionally, "[c]ourts have granted relief for claims that might have been minimal on a daily basis but, when aggregated, amounted to a substantial claim." *Lindow*, 738 F.2d at 1063. As a result, Plaintiffs' testimony can be extrapolated to assume a total amount of time in the aggregate spent on these tasks. Accordingly, these tasks were performed on a regular basis (multiple times a day on average over the course of the students' time in the clinical setting) and may easily have constituted more than a few minutes of time when considered in the aggregate.

Furthermore, Defendants' argument that it would be too administratively difficult to document the time spent on retail sales is unavailing: students could record their time after the conclusion of every client, just as other activities were recorded on their MPAs. Indeed, lawyers routinely record their time in six-minute increments.

Accordingly, the Court finds that there is a genuine dispute of fact as to whether the time spent on retail sales was de minimus.

## IV.   Conclusion

For the reasons set forth above, the Court GRANTS IN PART, DENIES IN PART Defendant's renewed motion for summary judgment. (ECF No. 134.) The Court determines as a matter of law that Plaintiffs were employees with respect to the janitorial tasks, which accounted for more than a de minimis portion of their time. Defendants' renewed motion for summary judgment is DENIED as to the janitorial tasks, and Plaintiffs are granted summary judgment for this segment of activities. Because the Court determines as a matter of law that Plaintiffs were not employees with respect to the client services, Defendants' renewed motion for summary judgment is GRANTED as to the client services. Because there is a genuine dispute of fact as to whether Plaintiffs' work engaging in retail sales constituted a de minimus portion of their time, Defendants' motion is DENIED as to the retail sales segment.

The Court will set a status conference following the issuance of the Court's opinion on Defendant Douglas J. AIC, Inc. and Douglas J.

Holdings, Inc.'s pending motion to dismiss (ECF No. 150), to discuss further case management deadlines.

IT IS SO ORDERED.

Dated: September 20, 2022        s/Judith E. Levy
Ann Arbor, Michigan             JUDITH E. LEVY
                                United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 20, 2022.

                                s/William Barkholz
                                WILLIAM BARKHOLZ
                                Case Manager